RUDOLF A. ZIVNUSKA AND ESTHER R. ZIVNUSKA, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61536. Filed November 9, 1959.

*Louis L. Meldman, Esq.*, and *Sherwin C. Peltin, Esq.*, for the petitioners.

*Delman H. Eure, Esq.*, and *Julian L. Berman, Esq.*, for the respondent.

PIERCE, *Judge:* Respondent determined deficiencies against the petitioners in income taxes and additions to tax as follows:

| Year | Deficiency | Additions to tax | | | |
|---|---|---|---|---|---|
| | | Sec. 291(a) | Sec. 293(a) | Sec. 294 (d)(1)(A) | Sec. 294 (d)(2) |
| 1950 | $2,160.20 | $381.95 | $108.01 | $152.78 | $91.67 |
| 1951 | 5,745.76 | 238.85 | 287.29 | 477.72 | 286.62 |
| 1952 | 6,159.80 | | 307.99 | 476.28 | 285.77 |
| 1953 | 5,551.70 | | 277.59 | 374.32 | 224.60 |

The issues for decision are:

(1) Whether in the taxable year 1951, the principal petitioner incurred a *business bad debt loss* of $129,496.26 or any other amount, in connection with cash advances made to or through the president of an insolvent corporation of which he was a principal stockholder, for use in satisfying claims against said insolvent corporation.

(2) Whether, by reason of any loss in connection with such advances, petitioner sustained a "net operating loss" within the meaning of sections 23(s) and 122 of the 1939 Code, in respect of which he is entitled to a net operating loss carryback deduction for the taxable year 1950, and a net operating loss carryover deduction for each of the taxable years 1952 and 1953.

(3) Whether additions to tax should be imposed: Under section 291(a) of the 1939 Code for the years 1950 and 1951, for failure to make and file a timely income tax return for each of said years; under section 293(a) for all taxable years, on the ground that at least part of the deficiency for each of said years is due to negligence, or intentional disregard of rules and regulations but without intent to defraud; and under section 294(d) for all taxable years, for failure to file declarations of estimated tax and for substantial underestimate of estimated taxes.

### FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by reference.

Petitioners, Rudolf A. and Esther R. Zivnuska, are husband and wife, residing in West Allis, Wisconsin. They filed a joint income tax return for each of the taxable years involved with the collector or district director of internal revenue at Milwaukee, Wisconsin. The wife, Esther, is involved herein solely because she was a party to the said joint returns.

Rudolf (hereinafter called the petitioner) was, at the time of the trial, engaged in business as a real estate broker and an investigator of defaulted bonds. In the years 1946 and 1948, which preceded the taxable years involved, he had been employed as a salaried secretary of Concordia Federal Savings and Loan Association, in Milwaukee; and during the taxable years 1950 through 1953, he continued to receive substantial salary from that association.

During these same years 1946 through 1948, petitioner also was one of the owners and an active participant in the business of Zivnuska-Kassulke Agency, Inc., in Milwaukee. This Agency operated a real estate and insurance business, in which it arranged for the making of mortgage loans for clients, and also handled the management of such loans and the collection of the payments due thereon. Petitioner personally handled all of such mortgage loans for such Agency; and he shared in the profits of its business.

In addition to the foregoing, the petitioner during the years 1946 through 1948, conducted a building construction and remodeling business, both individually and as the principal party in interest

in a building corporation which is not identified in the record. Also, during the years 1947 and 1948, he actively engaged in the purchase and cutting of standing timber, in the reducing of such timber to lumber, and in the buying and selling of lumber under arrangements with a lumber dealer. From this activity also he derived substantial gains.

Petitioner did not currently file any Federal income tax return for any of the years 1946 through 1949. This was conceded by him on his 1951 return which was the first return filed by him for any year subsequent to 1945. Also he does not have any books of account from which the amounts of his income for any of the years 1946 through 1950 can be ascertained. He has conceded however, in a net worth statement which he filed with his delinquent income tax return for the year 1950, that in each of the years 1946 through 1949 he had net income in an amount more than sufficient to require the filing of a return.

In 1938, petitioner became acquainted with a man named Frank Furedy, who had invented an ultraviolet ray lamp for cosmetic and therapeutic uses. Petitioner at that time expressed a desire to join with Furedy in the business of manufacturing and selling such lamps; and thereupon in said year 1938, he and Furedy created a Wisconsin corporation known as Sun-Kraft, Inc., for such purpose. Petitioner organized the corporation and was its president; and Furedy was vice president and treasurer. The understanding was that petitioner would finance the venture, as funds were required; but after he had invested a total of $6,000, for which he received shares of stock, he in 1938 requested Furedy to relieve him, and he assigned to the latter all his shares of the stock. Furedy, as sole stockholder, then moved the business to Chicago. Subsequently in 1944, Furedy voluntarily reimbursed petitioner for the entire amount of his $6,000 stock investment.

In 1944, Furedy dissolved the above-mentioned Wisconsin corporation, and organized another corporation under the laws of the State of Illinois, to produce the ultraviolet ray lamps. And, within a few months thereafter, he caused this Illinois corporation to be reorganized as a Delaware corporation to carry on the same business. This Delaware corporation, which also was called Sun-Kraft, Inc., and of which Furedy was at all times the president, is the corporation here directly involved and hereinafter referred to as Sun-Kraft.

Sun-Kraft had both common and preferred shares of capital stock; and it issued and sold a substantial number of these shares to the public. Under date of February 5, 1945, Furedy caused 1,000

shares of the common stock to be issued to petitioner, for which petitioner paid no consideration.

During the first 2 years of Sun-Kraft's existence, its operations were very successful; it derived substantial profits; and it paid dividends to its stockholders in both 1945 and 1946, and also one dividend in the first part of 1947. In 1947, petitioner purchased 10,000 additional shares of Sun-Kraft's common stock for $10,000 cash; and a stock certificate evidencing the same was issued to him under date of February 17, 1947.

Early in 1947, Sun-Kraft experienced serious financial and operating difficulties. The Federal Food and Drug Administration, acting through legal proceedings instituted by the Department of Justice, obtained an order for seizure of all the ultraviolet ray lamps manufactured by said corporation. This seizure apparently was based on the ground that the lamps were either harmful to users, or that they did not provide the cosmetic or therapeutic benefits attributed to them. Such seizure of the lamps caused creditors of Sun-Kraft to "rush in"; and the corporation, with a view to saving its business and to facilitating the sale of its other products, which included cosmetic creams and sterilization lamps, proceeded to mortgage its real estate and take other steps for obtaining needed working capital. The pressure from creditors continued however; and, in the latter part of April 1947, Furedy (who as before stated was president of Sun-Kraft) made application to the United States District Court in Chicago, to have the corporation placed in receivership under chapter 11 of the United States Bankruptcy Act. This application was granted in a proceeding designated as Docket No. 47–B–150; and a receiver for Sun-Kraft was appointed, who took over its records, accounts, and about $128,000 of cash, which was all the cash then available. The corporation was permitted to remain in possession of its physical assets and to continue operations, pending the making of suitable arrangements with its creditors.

On the evening following this development, petitioner came to Furedy's home in Chicago; and the latter told him what had happened. Furedy appealed to petitioner for help, on the grounds that it was desirable that the corporation be not dissolved, and that petitioner was the owner of 11,000 shares of the corporation's stock. Furedy told petitioner that he required $25,000 additional cash to turn over to the receiver by 10 o'clock the next morning, in order that the corporation might be permitted to continue operations under chapter 11 of the Bankruptcy Act, and not "be yanked out of Chapter 11 into Chapter 10." Petitioner thereupon advanced such $25,000 to Furedy for the above-mentioned purpose. There is no evidence that any date was fixed for repayment of this advance-

ment, or that any provision or understanding was made for payment of any interest thereon. This was the first advancement made by petitioner to or through Furedy, for the benefit of Sun-Kraft.[1]

Both petitioner and Furedy had faith in the corporation's products; and they believed that the corporation could be operated successfully if suitable arrangements could be made with the Food and Drug Administration and the creditors, so as to release it from the receivership. Furedy, at the time of the commencement of the receivership, raised additional funds which he paid over to the receiver for the benefit of Sun-Kraft's creditors, by mortgaging his personal properties. Also, from time to time thereafter, he received further advancements for such purpose from petitioner, which are claimed to be evidenced by the following instruments.

Under date of July 17, 1947, petitioner and Furedy executed an instrument which reads as follows:

*July 17, 1947*

This will acknowledge receiving from Frank Furedy, 122,789 shares of SUN-KRAFT, Inc. common stock, and 250 shares of SUN-KRAFT, Inc. preferred stock.

The above stock is to be held by the undersigned, in escrow, as collateral against a loan of $27,500.00, bearing interest at the rate of 4% per annum.

This amount of money is loaned to Frank Furedy, and he is to use his best judgment in using it toward satisfying SUN-KRAFT, Inc. creditors so that that company will be discharged from receivership.

Although there is no definite time set when this money will be repaid to the lender:

R. A. Zivnuska
Milwaukee, Wisconsin

it is understood that Frank Furedy, of Chicago, Illinois, is going to repay it as quickly as possible after the company is discharged from receivership.

Signed: R. A. Zivnuska
R. A. ZIVNUSKA
/s/ Frank Furedy
FRANK FUREDY

Under date of September 12, 1947, Furedy executed and delivered to petitioner, another instrument in the form of a promis-

---

[1] There is a conflict between the testimony of petitioner and the testimony of his witness Furedy, as to the time of such $25,000 advance. Petitioner's position is that such amount was advanced prior to the receivership; and in support thereof, he produced a promissory note for $25,000, dated December 6, 1941, on the back of which were notations of various payments totaling $25,000, set opposite dates in 1946. Petitioner conceded however that the instrument was not executed on the date it bears; and that one of the dates shown on the back of the note also was erroneous. Furedy was not able to identify the instrument; stated that he was not in need of money in 1946, when Sun-Kraft was operating successfully; and he further said: "He [petitioner] discussed this particular thing with me. I told him openly I don't remember this particular twenty-five thousand dollars, that I have borrowed this kind of money before receivership because I wasn't in any trouble." He further testified repeatedly that all the advances involved were made after Sun-Kraft went into receivership.

In making the above finding, we have accepted the testimony of Furedy in this regard, and have rejected the conflicting testimony of petitioner.

sory note for $10,000, which provided for payment only 12 days thereafter. The provision for payment of interest was stricken out.

Under date of July 21, 1950, Furedy signed and delivered to petitioner still another instrument, which reads as follows:

> Received of R A Zivnuska
> Sixteen thousand and no/100 dollars, and
> Eighteen hundred and no/100 dollars, and
> Fifteen thousand and no/100 dollars
> Acknowledging payments made during 1949
> and 1950 to date.
>
> /s/ Frank Furedy

The reason for the execution of this instrument was that, at times, petitioner had rushed to Chicago to supply money as it was needed; and then, at some time later, he prepared the above receipt, and asked Furedy to sign it "for his protection." Such money was supplied because both he and Furedy were very anxious to save the business.

The aggregate of the amounts shown on the face of all the above instruments, plus the initial advancement of $25,000, is $95,300. Petitioner was unable to produce any book of account, canceled check, bank record, or any other documentary evidence which would tend to support the making of any advances to or through Furedy in any additional amount.[2]

All the advancements made by the petitioner to or through Furedy were turned over to Sun-Kraft's receiver, for use in satisfying claims against the corporation.

Either at the time of the execution of the above-mentioned instrument dated July 17, 1947, or sometime thereafter, Furedy and petitioner entered into an arrangement, under which Furedy endorsed in blank and turned over to petitioner 100 per cent of all his shares of stock in Sun-Kraft, which represented a controlling interest in said corporation. The parties agreed that one-half of these shares (none of which was transferred of record) thereupon became petitioner's separate property, so that he and Furedy would thereafter be "joint owners" of all shares which Furedy had theretofore held; and it was further agreed that petitioner should hold, pending the outcome of the Sun-Kraft receivership, all of the shares of both parties. Another feature of the arrangement was that Furedy was relieved from legal obligation to petitioner for repayment of the

---

[2] In the net worth statement which petitioner attached to his delinquent 1950 return, there are indications that during the years 1949 and 1950 petitioner also advanced money directly to Sun-Kraft. Petitioner made no mention at the trial of these direct advancements, and he also made no attempt to prove any item of said net worth statement.

advancements made to or through Furedy. for the benefit of Sun-Kraft.[3]

On September 26, 1947, an involuntary petition in bankruptcy was filed against Furedy, personally, in the United States District Court in Chicago, and was docketed as No. 47–B–358. After extended hearings on this petition for adjudication, and also after examinations had in connection therewith, the proceeding was dismissed on February 17, 1949, without adjudication being entered thereon.

At some time in 1949, a second bankruptcy proceeding, designated as Docket No. 49–B–683, was filed against Sun-Kraft, Inc., in the United States District Court in Chicago. No further facts regarding this proceeding are disclosed by the record in the instant case.

Subsequently in 1951, a third bankruptcy proceeding was instituted against Sun-Kraft, Inc., under chapter 10 of the Bankruptcy Act, in the District Court in Chicago, which was docketed as No. 51–B–246. In this same year, the corporation was adjudicated a bankrupt. No distributions were made to general creditors; and in said year the corporation's stock became worthless. None of the above-mentioned loans or advancements made by petitioner to or through Furedy was ever repaid. There is no evidence that petitioner ever instituted any proceeding in an attempt to enforce any legal obligation of Furedy in respect thereto.

In connection with the bankruptcy, several patents which Furedy had assigned to Sun-Kraft were, under the terms of such assignment, returned to him. These patents were then old; and in 1951 Furedy had no income or property. Later, he invented a new type of lamp, known as Viopak, for which the first patent was applied for in 1955. Since about 1952, he has been a manufacturer associated with a corporation known as Viopak, Inc.

Petitioner did not file an income tax return for the year 1950 until more than 3 years after the required filing date. The return itself does not list any items of gross income, or any deductions. But attached thereto are two income tax withholding statements (Form W–2) showing that he had received gross income from salaries of $10,200. Also attached thereto is the above-mentioned net worth statement of petitioner, on which he listed a net operating loss carryback from the year 1951 in the amount of $14,403.96. No net income and no tax liability were reported on this return.

Petitioners' income tax return for the year 1951 was delinquently filed on August 19, 1952. On a business schedule attached thereto,

---

[3] There is a direct conflict between the testimony of petitioner and his witness, Furedy, as to whether Furedy was relieved from legal liability for repayment of the advances. Petitioner concedes that he did receive one-half of Furedy's stock. We have, in this regard, accepted the testimony of Furedy, and rejected the conflicting testimony of the petitioner.

which is entitled "Construction-Contracting-Loaning-Insurance" and in which petitioner described himself as a "Contractor," he claimed a deduction for a *business bad debt* in the amount of $139,500, and showed a net operating loss of $125,522.22. No net income and no tax liability were reported on this return. Subsequently in May 1954, petitioners filed an amended return for 1951, in which the same items were reported, but in which the amount of the claimed deduction for a business bad debt was reduced to $129,496.36, and in which the amount of the said net operating loss was reduced to $115,518.58. On this amended return also, no net income and no tax liability were shown.

Petitioners' returns for the years 1952 and 1953 were timely filed. In the 1952 return he claimed, as a miscellaneous personal deduction, a "1951 business loss carry-over" of $27,008.93; and in the 1953 return he claimed, as a deduction on a business schedule, a "business loss carry-over" from 1951, of $24,228.59. No net income and no tax liability were reported on either the 1952 or 1953 return.

No declaration of estimated tax was filed either by petitioner or by his wife for any of the taxable years here involved.

Respondent, in his deficiency notice, disallowed the claimed deduction for a business bad debt of $139,500, which petitioner had claimed on his original 1951 return; but he allowed deduction for a long-term capital loss of $10,000, on the worthlessness of the shares of Sun-Kraft stock which petitioner had purchased for said amount in the year 1947. Respondent also determined that petitioner had not incurred any net operating loss for the year 1951; and he disallowed both the claimed operating loss carryback deduction for the year 1950, and the claimed net operating loss carryover deductions for the years 1952 and 1953. Respondent further determined that each of the additions to tax above mentioned should be imposed.

The petitioner, for the year 1950, did not, as required by the regulations, "carefully prepare his return so as to fully and clearly set forth the data therein called for," including the items of his gross income, deductions, and credits (Regs. 111, sec. 29.51–5); and for both of the years 1950 and 1951, he did not, in conformity with the regulations, keep such permanent books of account or records as were sufficient to establish the amounts of all items of his gross income and deduction (Regs. 111, sec. 29.54–1). At least a part of the deficiency for each of the years here involved is due to negligence or intentional disregard of rules and regulations.

OPINION.

This case presents a not unfamiliar situation, where a principal stockholder of a corporation in receivership provided cash for the

insolvent corporation's benefit over a period of about 3 years, in what proved to be a futile effort to prevent the corporation being adjudicated a bankrupt. Decision of the issues herein presented is complicated by the facts that such stockholder, who is the principal petitioner herein, failed to keep adequate books and records; and that there are important conflicts between his testimony and that of the president of the corporation involved, who testified as a witness on his behalf.

Petitioner contends: (1) That he advanced to Frank Furedy who was the president of the insolvent corporation, a total of $129,496.26 for the corporation's benefit; (2) that these advances represented "loans" to said president, which became worthless in 1951 when the corporation was adjudicated a bankrupt; (3) that the losses incurred in respect to such advances represented *business bad debts* incurred in "a business of loaning money for profit," which he operated in said year 1951; and (4) that, by reason of all the foregoing, he not only sustained a *business bad debt* loss of $129,496.26 which is deductible in full for the year 1951, but also that he thereby sustained a "net operating loss" for said year, (listed in varying amounts of $125,522.22, $115,518.58, $112,911.93, and $102,908.27), in respect of which he should be allowed a net operating loss carryback deduction for the preceding year 1950, and net operating loss carryover deductions for each of the following years 1952 and 1953.

The respondent, on the other hand, disputes all these contentions. His position is that petitioner has failed to establish any advances made to or through Furedy of more than $95,300; that such advances were, in truth and in substance, not "loans" to Furedy which he was personally liable to repay, but were contributions of capital to the insolvent corporation; that petitioner's losses were not incurred in any business which he was regularly carrying on in 1951; and that he did not incur in said year any business bad debt or any net operating loss, within the meaning of the applicable sections of the Internal Revenue Code of 1939.

We agree with the above-stated positions of the respondent.

1. As regards the amount of the advances which petitioner made to or through Furedy for the benefit of the insolvent Sun-Kraft corporation, petitioner was unable to produce at the trial any books of account, any canceled check, or any bank record, which would tend to support his contention that such advances totaled $129,496.26. Rather, he relied on unsupported oral estimates of himself and Furedy, that the total amount advanced ranged between $125,000 and $150,000; and also upon certain miscellaneous receipts, notes, and acknowledgments, which taken at their full face amounts do

not total more than $95,300. Moreover, petitioner conceded at the trial, his inability to produce any supporting evidence which would indicate that his advances exceeded $95,300; and, in answer to a question as to whether he had made other advances to Furedy between 1946 and 1950, he testified: "Well, there were some others. I don't recall them. I don't have any other records."

The respondent, on his brief, has requested us to determine that the total amount of such advances was $95,300; and, notwithstanding the unsatisfactory character of the proof, we accept the concession implied by respondent's request. We hold that the aggregate amount of advances which petitioner made to or through Furedy for the benefit of Sun-Kraft, Inc., was $95,300.

2. As regards the classification of such advances, it is true that both petitioner and Furedy characterized them as "loans"; and also that some of the instruments relied upon employ this same term. But it is well settled that, in determining the character of transactions for Federal income tax purposes, labels and forms adopted by the parties, though of some evidentiary value, are not conclusive. See *Emanuel N. (Manny) Kolkey*, 27 T.C. 37, 57–58, affd. 234 F. 2d 51 (C.A. 7); *Gregory* v. *Helvering*, 293 U.S. 465. The important consideration is not the formalities (however meticulously observed) in which the parties cast their transactions, but rather the substance of such transactions and the true nature of the relationship created thereby. *Emanuel N. (Manny) Kolkey, supra; Griffiths* v. *Helvering*, 308 U.S. 355; *1432 Broadway Corporation*, 4 T.C. 1158, affirmed per curiam 160 F. 2d 885 (C.A. 2).

In the instant case, we have found as a fact that all the advances here in question were made during the period that the corporation was insolvent; and there is no dispute that they were made for the specific purpose of paying liabilities of the insolvent corporation, in the hope that the corporation might be taken out of the receivership without being adjudicated a bankrupt. The need for contributions of equity capital is abundantly clear.

We further have found as a fact, that the first of such advances was made immediately following the entry of the order by the United States District Court, which placed the corporation in receivership. Petitioner at that time came to Furedy's home in Chicago, where he was informed of what had happened, and where he acceded to Furedy's request that he provide $25,000 cash which had to be turned over to the receiver the next morning. Furedy, in making this request, pointed out to petitioner that it was desirable that the corporation be not dissolved, and that petitioner was one of the principal stockholders. No promissory note or other obligation

of indebtedness was executed at that time; and no provision was made as to any date for repayment, or for payment of any interest.

The second advance of $27,500 also was not evidenced by any promissory note, but merely by an acknowledgment, bearing date of July 17, 1947. It recited that Furedy had turned over to petitioner certain shares of Sun-Kraft stock which was to be held "in escrow, as collateral against a loan," at interest of only 4 per cent per annum. The instrument provided specifically that the money was to be used for the purpose of satisfying Sun-Kraft creditors, "so that that company might be discharged from receivership"; and it further stated: "[T]here is no definite time set when this money will be repaid to the lender."

At or shortly after the date of the foregoing acknowledgment, petitioner and Furedy entered into an arrangement or "deal," under which Furedy endorsed in blank, and deposited with petitioner, 100 per cent of all his shares of common and preferred stock in Sun-Kraft. It was agreed at this time that one-half of these shares should immediately become the outright property of the petitioner, so that the parties would thereafter be "joint owners" of all shares which Furedy had theretofore owned. Furedy testified that he had given petitioner this half of his total holdings, "as consideration for all these loans"; and that he had no legal obligation to petitioner to repay the same. Petitioner conceded, in his testimony, that he did thus acquire ownership of half of all Furedy's shares of Sun-Kraft stock (which thereby made him an equal coowner of the controlling equity in Sun-Kraft); but he contended, contrary to Furedy's testimony, that the latter's personal liability survived. After seeing and hearing both of these witnesses, and after considering and weighing all the evidence on this point, we are convinced that Furedy's version of the transaction should be accepted, and that petitioner's contrary, self-serving testimony in this regard should be rejected.

The third advance was evidenced by a promissory note for $10,000, dated September 12, 1947. It is significant that the provision for payment of interest on this note was stricken out; and that the date of maturity was specified to be only "12 days after date"— which seems wholly artificial, in view of the facts that Furedy had by that time fully mortgaged all his property and was on the verge of having a petition in bankruptcy filed against him. Such petition actually was filed on September 26, 1947.

The items included in the fourth group of advances again were not evidenced by any promissory note, but merely by an informal receipt, written on a blank sheet of paper dated July 21, 1950. This instrument acknowledged receipt of three payments made on some

unidentified prior date "during 1949 and 1950 to date." Here again, there is no evidence of any maturity date for repayment of the sums mentioned, and no evidence of any provision for payment of interest. Furedy's explanation of this receipt was: "[T]here were times when he [petitioner] rushed to Chicago and given [gave] *us* money as *we* needed it, and didn't get a receipt or note for it, and he gave me this paper where he enumerated these loans and asked me to sign them for his protection. * * * [He] gave them as *we* needed them because *both of us* were very anxious to save that business." (Emphasis supplied.)

Notwithstanding the large amount of the advances and the hazardous situation which confronted both Furedy and Sun-Kraft, petitioner received no collateral security other than stock of the insolvent corporation, for whose needs the advances were made. He fully understood that he could not expect to recover such advances, unless the corporation were saved from dissolution in bankruptcy.

In the net worth statement which petitioner filed in 1954, he definitely indicated that, during each of the years 1949 and 1950, he also made advances *directly* to Sun-Kraft. It is significant that these years were subsequent to the time of the "deal," with respect to which Furedy testified that he was relieved of personal liability. And it is significant also, that there is no evidence of petitioner having at any time attempted to enforce personal liability against Furedy.

We hold, on the basis of all the foregoing, that the advances actually were contributions of petitioner to the risk capital of the corporation. Although they were delivered to Furedy, they were not available for his personal use, but were to be used only for the specific purpose of paying off claims against Sun-Kraft. Furedy's obligation was discharged when he applied the advances for such specified and limited purpose.

3. Since the advances were contributions of risk capital, as we have decided, there was no debt of Furedy on which a bad debt loss could have been sustained by petitioner in 1951, when Sun-Kraft was adjudicated a bankrupt. This alone is sufficient for disposition of the case. But, even if it be assumed that there was a "debt," petitioner failed to establish his contention that he was engaged in a "business of loaning money for profit," so that any loss on such a debt could qualify for deduction as a *business bad debt*.

Aside from petitioner's own self-serving statements, there is no evidence that he was, in 1951, engaged in a "business of loaning money for profit"; or that he either derived any profit or suffered any loss in the operation of such a business. It is the year in which

the loss on the advances was incurred, and not the years in which such advances were made, that is material. Sec. 23(k)(4), 1939 Code; Regs. 111, sec. 29.23 (k)-6; *S.D. Ferguson*, 28 T.C. 432, affd. 253 F. 2d 403 (C.A. 4). There is no indication that petitioner had, for money-lending purposes, any business office, business organization, business stationery, or business forms to evidence loans; that he kept any business books; that he either advertised, or otherwise held himself out, as a lender of money; that he made any loans in 1951; or that he employed any of the methods or practices normally used by those who carry on a money-lending business.

Nor are we convinced that, even in the preceding years when the advances were made, petitioner was personally engaged in operating a "business of loaning money for profit." It is true that at the trial he presented numerous instruments which purported to show that certain real estate mortgage loans had been executed in his name; and also that he had received certain chattel mortgages, and made certain personal loans of relatively small amounts. But most of these transactions were in years far remote to the advances made for the benefit of Sun-Kraft; and they were of an entirely different character than the advances here involved. Some of these transactions represented merely the preliminary phase of arranging mortgage loans for clients of the Zivnuska-Kassulke Agency which did not make such loans in its own name. Petitioner handled these mortgage loans in the office of said agency, while he was acting as the mortgage-loan manager of that agency; and he held them in his name only for temporary periods during which they were recorded in the office of the Register of Deeds; and they were then assigned to a bank or other investor, and turned over to the above-mentioned agency for handling the periodic collections thereon. Some of the other transactions did not, as was conceded on cross-examination, involve loans of money; but rather they were obligations related to petitioner's building construction and remodeling business. And others were chattel mortgages related to petitioner's business of producing, buying, and selling lumber. Petitioner conceded that during said preceding years he did not have sufficient capital to carry substantial loans. And in these preceding years also, he did not maintain any money-loaning office or organization, or employ the methods and practices normally used by those who regularly carry on a money-lending business. Moreover, the net worth statement which petitioner filed, shows that he held only a very limited number of relatively small new accounts receivable, during any year subsequent to 1945. And, since he filed no current income tax return for any of the years 1946 through 1949, had no

accounting books or records for that period,[4] and estimated on his net worth statement that his net income was far less than the salaries which he had received—the indication is that any money-lending he did was not at a profit. Indeed there is no evidence that petitioner ever derived any profit in any year from a business of lending money.

We hold that petitioner's loss in connection with the advances for the benefit of Sun-Kraft was not incurred in the operation of any trade or business; that it was not a business loss; that it does not qualify for deduction as a *business bad debt;* and that it did not produce any "net operating loss," in respect of which net operating loss carryback or carryover deductions are allowable.

4. As regards the additions to tax which respondent determined under sections 291(a) and 294(d)(1)(A), petitioners did not present any evidence or any argument on brief; and accordingly, for lack of prosecution, we approve the respondent's determinations as to these additions to tax for all taxable years involved.

As regards the additions to tax which respondent determined under section 294(d)(2), the Supreme Court held in *Commissioner* v. *Acker*, 361 U.S. 87, that an addition to tax under section 294(d)(2), in the case of a failure to file a declaration of estimated tax, was not warranted in the light of the wording of the statute. Consequently, respondent's determination as to the additions to tax under section 294(d)(2) for all taxable years involved, is disapproved.

5. As regards the additions to tax determined by respondent under section 293(a) (pertaining to negligence, or to intentional disregard of rules and regulations but without intent to defraud), petitioner has objected on brief to the imposition of the same; but, as to these also, he presented no evidence to meet his burden of establishing error in the respondent's determinations.

We think the instant case clearly falls within the intendment of the provisions of section 293(a).

In *Spies* v. *United States*, 317 U.S. 493, the Supreme Court said:

> The United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures * * *. This system can function successfully only if those within or near taxable income keep and render true accounts. In many ways taxpayers' neglect or deceit may prejudice the orderly and

---

[4] Attached to the net worth statement which petitioner filed in 1954, for the period from Dec. 31, 1944, through Dec. 31, 1950, he represented:

> The net worth statement and the adjustments made therein which were necessary for the determination of net taxable income were prepared partially from recollection and in some instances contain items and amounts which represent approximations of facts contained therein. In the preparation of this net worth statement the taxpayer, Rudolf A. Zivnuska, was unable to properly ascertain the correct facts alone.

The net worth statement did not purport to itemize the gross income or deductions for any of the years covered.

punctual administration of the system as well as the revenues themselves. Congress has imposed a variety of sanctions for the protection of the system and the revenues. * * *

Although the above case dealt primarily with criminal sanctions, Congress has provided sanctions to aid in enforcement of the tax laws, which are both civil and criminal in character. And it is well settled that the invocation of one of such sanctions does not exclude resort to the others. *Helvering* v. *Mitchell*, 303 U.S. 391; *Fred N. Acker*, 26 T.C. 107, 115. As we said in the latter case:

[A]dditions to the tax are remedial in character, not penal or punitive; they are provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the expense of investigation and the loss resulting from taxpayers' neglect or deceit. *Spies* v. *United States, supra; Helvering* v. *Mitchell, supra.* * * *

The petitioner in the instant case is an alert, intelligent, and well-educated man; and, since he was a salaried secretary of the Concordia Federal Savings and Loan Association, it may reasonably be assumed that he not only was familiar with books of account, but also was aware of his duties and obligations under the income tax laws and regulations, to keep permanent books of account or records, and to carefully prepare income tax returns which would clearly set forth the data therein called for—so that the system of self-disclosure mentioned in the above-cited *Spies* case could function successfully. But this he did not do. As before pointed out, he did not for the years 1947 through 1950, when the advances here involved were being made, keep and maintain any books of account or currently file returns, from which either the amounts or the true nature of his income and deductions could be ascertained. And in his original return for the year 1951, in respect of which the deficiency for the first taxable year was determined, he lumped into a single nondetailed item, a claim for deduction of a business bad debt loss of $139,500, which is now conceded to have been excessive. One of the items included in this amount was a loss of $10,000 on an investment in shares of stock of Sun-Kraft; and petitioner, because of his familiarity with capital assets as listed in his various returns, must or should have been aware that this $10,000 item was not a "debt" in respect of which an unlimited loss could be deducted, or a net operaing loss could be computed. Said item of $139,500 included also an amount of $34,196.36, which coincides exactly with an item described in petitioner's net worth statement as "loans or accounts receivable" due from Sun-Kraft. This item was neither mentioned nor attempted to be proved at the trial; and if it existed at all, it must have represented contributions of risk capital to Sun-Kraft at times when it was in the control of a receiver who was engaged in reducing, not increasing, claims of general creditors. And the balance of

said item of $139,500 is the amount of $95,300 hereinabove considered. If petitioner had observed his duties of keeping even reasonably lucid books of accounts or records, and of carefully preparing his returns so as fully and clearly to set forth the data therein called for, the factual items here involved could have been properly identified and classified, without necessity for extended administrative and judicial proceedings.

It is to be observed that the effect of petitioner's derelictions permeated the entire amounts, not merely particular portions, of his claimed "business bad debt loss" and claimed "net operating loss"; and that, by reason of the "spreading" feature of the statute which provides for carryback and carryover deductions, his derelictions affected all of the taxable years here involved. He reported for each of these years no net income and no tax liability.

We hold that at least part of the deficiency for each of the taxable years stemmed from, resulted from, and was "due to negligence, or intentional disregard of rules and regulations but without intent to defraud," within the meaning of section 293(a).

*Decision will be entered under Rule 50.*