Ralph W. James and Myrtle B. James v. Commissioner. James R. Clark, Jr. v. Commissioner.
James v. Commissioner
Docket Nos. 91432, 92499.
United States Tax Court
T.C. Memo 1962-173; 1962 Tax Ct. Memo LEXIS 132; 21 T.C.M. (CCH) 953; T.C.M. (RIA) 62173; July 25, 1962
Henry C. Diehl, Esq., 900 Wilshire Blvd., Los Angeles, Calif. and John H. Hall, Esq., for the petitioners in Docket No. 91432. Jack E. Roberts, Esq., for the petitioner in Docket No. 92499. Edward M. Fox, Esq., for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The respondent has determined deficiencies in the income tax of petitioners as follows: Dkt. No.
Petitioner
Year
Deficiency
91432
Ralph W. James and
1956
$41,562.85
Myrtle B. James
92499
James R. Clark, Jr.
1956
68,233.62
*133 The issue common to both cases is the extent to which Ralph W. James and James R. Clark, Jr. are taxable on the earnings of a partnership known as James-Pond-Clark during the period between January 1, 1956, and May 31, 1956. The issue in Docket No. 91432 relating to a medical expense deduction will automatically be resolved upon the basis of the foregoing issue. In Docket No. 92499 the petitioner has also contested respondent's disallowance of a business bad debt deduction in the amount of $53,500. No error has been assigned by petitioner to respondent's other adjustment in the statutory notice relating to a loss claimed by petitioner as a result of the sale of petitioner's interest in a partnership known as Circle Seal Supply Company. Findings of Fact Stipulations of facts were filed by the parties and are incorporated herein by this reference. For convenience the facts applicable to the several issues will be segregated and set forth under appropriate headings. Partnership Issue Ralph W. James, hereinafter referred to as James, and Myrtle B. James are husband and wife residing in Pasadena, California. They filed a joint Federal income tax return for the calendar year *134 1956 with the district director of internal revenue at Los Angeles, California. James R. Clark, Jr., hereinafter referred to as Clark, is an individual residing in Los Angeles, California. He filed an individual Federal income tax return for the calendar year 1956 with the district director of internal revenue at Los Angeles, California. On June 1, 1947, James, Clark and William B. Pond formed a general partnership in Los Angeles, California, known as James-Pond-Clark, sometimes hereinafter referred to as the partnership, for the principal purpose of engaging in the manufacture and sale of valves. The Articles of Co-Partnership provided that each of the partners had a 33 1/3 percent interest in the assets and profits, and each was liable for 33 1/3 percent of the losses and liabilities. The Articles of Co-Partnership contained no requirement that any amendments to it were to be in writing. On May 23, 1948, Pond withdrew from the partnership and assigned all his right, title and interest in the partnership to the remaining partners. Thereafter, James and Clark continued as equal partners. The partnership maintained a commercial partnership account at the Southern Commercial *135 and Savings Bank, Pasadena, California. The account was opened on June 8, 1950, and withdrawals therefrom were originally authorized to be made on the signatures of both Clark and James. On April 6, 1951, a Power of Attorney was executed by both James and Clark, authorizing Grace B. Henderson to sign, together with either James or Clark, checks on the partnership account. Clark's authorization to co-sign partnership checks continued until May 31, 1956. In addition to being a partner, Clark held the title of engineering and manufacturing manager and was responsible for the engineering and manufacturing phases of the company. James held the title of general manager and was responsible for the business and commercial aspects of the company. In the early part of November 1955, James became dissatisfied with the arrangement and suggested to Clark that the partnership be dissolved. Clark was agreeable to the termination but no agreement was reached at that time as to the date of termination or the manner in which it was to be accomplished. At a subsequent meeting, although no date of termination had yet been decided upon, the partners agreed that James would buy out Clark and that the *136 latter would cease to be active in the company after November 30, 1955. Other meetings took place between the partners in November 1955, and the dates of November 30, 1955, December 31, 1955, and January 3, 1956, were considered as possible termination dates. At these meetings the partners discussed the purchase price of Clark's interest and tentatively agreed to use the net worth of the partnership as of December 31, 1955, as the basis for their negotiations. While the discussions involving termination of the partnership were continuing, Clark became interested in the automotive air-conditioning business and began preparations to set up a corporation and to engage in said business. In order to obtain funds to finance this venture, Clark asked James if he could withdraw funds from his capital account in excess of normal withdrawals. James agreed, and during the period November 1, 1955, to December 31, 1955, Clark withdrew from his capital account sums totalling $34,903.30. Once the partners had agreed to terminate the partnership, Clark began to devote less and less time to the affairs of the partnership and more and more time to his new venture, and as a result many of his partnership *137 duties were assumed by his assistant, William H. Simons. Sometime toward the end of November 1955, James announced to the employees of the partnership that Simons had, in fact, replaced Clark as engineering and manufacturing manager as of November 16, 1955. Following the announcement, Simons immediately took over the remainder of Clark's duties which he had not previously assumed and within 2 to 4 weeks thereafter moved into the office heretofore occupied by Clark. Although the partners had no specific agreement regarding the drawing of a weekly or monthly sum, it had been their practice in the past for each of them to draw $2,000 a month from the partnership. However, in view of the fact that Clark was not to be active in the partnership affairs after November 30, 1955, the partners agreed that as of December 31, 1955, Clark would no longer receive the monthly draw. Sometime in the latter part of November or the early part of December 1955, the partners tentatively agreed as to the terms of the termination agreement, and Paul R. Cote, James' attorney, was requested to prepare an appropriate document. The document was prepared but, owing to the fact that Clark was in Texas for *138 about 2 weeks or so during the month of December, no final action could be taken on the termination agreement until he returned. After returning from Texas, Clark had several telephone conversations with James, and a meeting was set up for the early part of January in Cote's office for the purpose of executing the necessary documents. After arriving at Cote's office, Clark was informed by Cote that the execution of the termination agreement at this time would cause some inconvenience to James since the latter had not had time to set up the corporations to which he intended to transfer the partnership business. Clark was then asked if he would agree to a continuation of the partnership if it would not cost him anything and he were paid the sum originally agreed upon when the partnership was ultimately terminated. Clark expressed concern over the fact that if the partnership were continued, a possibility existed that he would be subject to an income tax liability for half of the partnership income during the extended period even though under the arrangement then proposed by James he was not to receive such income and was only to receive the amount originally agreed upon. James then *139 agreed to pay any tax liability that Clark might incur as a result of being charged with partnership income during the extended period. On such condition Clark indicated that he had no objection to continuing the partnership. Following the meeting, Clark did not believe that he had any rights in the income earned thereafter by the partnership. On January 11, 1956, James and Clark executed, in the name of the partnership an instrument entitled Lease Contract, constituting a lease of certain machine tools from The Warner & Swasey Company. James and Clark acknowledged before a notary public that they executed said Lease Contract as partners. On January 17, 1956, James and Clark, in the name of the partnership, executed an instrument entitled Renegotiation Agreement with the United States whereby certain profits derived by the partnership from a contract with the United States were eliminated pursuant to the Renegotiation Act of 1951. On February 17, 1956, James and Clark executed a Power of Attorney authorizing Simons to sign checks on the partnership account. On April 19, 1956, James and Clark executed, in the name of the partnership, a Replacement Contract replacing the earlier lease *140 with The Warner & Swasey Company. James and Clark acknowledged before a notary public that they executed the Replacement Contract as partners. With the exception of executing the foregoing documents, Clark performed no other services on behalf of the partnership after December 1, 1955. On April 25, 1956, James and Clark entered into an agreement providing for the sale to James of Clark's right, title and interest in the partnership. The purchase price was to be the amount of Clark's investment (capital) account as of May 31, 1956, reduced by (a) the sum of $7,500 and (b) the amount by which Clark's investment (capital) account had been credited with partnership profits from January 1, 1956, and increased by the proportionate amount of Clark's income tax, based upon the ratio that the profits of the partnership deducted in (b) above bore to the total taxable income of Clark in 1956. The agreement also provided, inter alia, that the partnership was to cease on May 31, 1956. Between January 1, 1956, and April 30, 1956, Clark withdrew from his investment (capital) account sums totalling $45,117.18, and during the month of May 1956 he withdrew an additional $20,000. On June 1, 1956, Clark *141 executed and delivered to James an assignment of his right, title and interest in the partnership. On the same date James and Clark executed a Notice of Dissolution of said partnership, which notice was duly published on June 4, 1956. During the period June 1, 1955, to May 31, 1956, the net income of the partnership was $226,400.67. During the period June 1, 1955, to December 31, 1955, the net income of the partnership was $113,577.01, and during the period January 1, 1956, to May 31, 1956, the net income of the partnership was $112,823.66. On his income tax return for 1956 James reported $113,200.34 as his distributive share of the net profits of the partnership for the partnership fiscal year ended May 31, 1956. On his income tax return for 1956 Clark reported as taxable income received from the partnership the sum of $56,788.50 which represented one-half of the net profits of the partnership for the period June 1, 1955, to December 31, 1955. On the basis that it was not taxable to him, Clark excluded from his income one-half of the partnership profits for the period January 1, 1956, to May 31, 1956. Unable to resolve the conflict between James and Clark as to the extent to which *142 each was taxable on the partnership income, the respondent determined that each of the partners understated his taxable income in the amount of $56,411.83. Respondent concedes, however, that his determination against James and Clark is in the alternative. Business Bad Debt Issue [1]
Clark, a university graduate with an engineering degree, has been engaged in various aspects of the engineering and manufacturing business during most of his adult life. Prior to and during a part of 1947 Clark was employed as the manufacturing superintendent of Burlake Manufacturing Company in Burbank, California. At that time he was engaged in no other business occupation or employment. As previously noted, on June 1, 1947, Clark became a partner in the partnership known as James-Pond-Clark, which partnership was engaged in the manufacture and sale of valves. Clark was the engineering and manufacturing manager of the partnership, and from June 1, 1947, to November 1, 1955, he devoted 100 percent of his time to the partnership business. Sometime in the latter part of 1952, Clark, James and Phillip Shepheard, who was an employee of James-Pond-Clark, together *143 with their wives, formed a partnership known as Circle Seal Supply Company. Circle Seal was engaged in the business of selling products as a manufacturers' representative in Southern California. Although Clark contributed some initial capital to Circle Seal and made several loans to it thereafter, no evidence was offered to show the extent to which Clark participated in the management and operation of the company. Clark retained his interest in Circle Seal until October 1956, at which time he sold his interest therein to James. From 1948 until O3tober 1956, Clark, together with James, invested quite heavily in oil-well drilling ventures. Clark, however, was not personally active in the business of the ventures and on October 1, 1956, sold his interests in said ventures to James. Prior to November 1955, the partnerships James-Pond-Clark and Circle Seal, together with the oil-well drilling ventures, were the only business or commercial activities in which Clark had an interest. Prior to November 1955, Clark had been approached by Robert L. Creel, whom he had met at a social gathering, with a proposition which would involve Clark's financing Creel in the automotive air-conditioning *144 business. Shortly thereafter Clark and James had differences of opinion which culminated in their decision to terminate their partnership in James-Pond-Clark. In view of the impending dissolution of the partnership, Clark decided that the automotive air-conditioning business represented a new endeavor in which he could participate. Consequently, rather than finance Creel in the business, Clark decided that, together with Creel, he would form a corporation to engage in the automotive air-conditioning business. Accordingly, on December 12, 1955, the Refrig-Rite Service Corporation, sometimes hereinafter referred to as the corporation, was incorporated in the State of California for the purpose of buying, selling, installing and servicing commercial and light industrial and automotive refrigeration and air-conditioning equipment. The corporation was authorized to issue capital stock of $75,000, consisting of 7500 shares of common stock having a par value of $10 per share. Creel was made the president and operating manager of the corporation, and Clark became its secretary and treasurer. As secretary-treasurer, Clark had charge of and exercised control over the books of the corporation. *145 Under the agreement between Clark and Creel, Clark was to make all the capital contributions to the corporation. It was further agreed that Clark was also to receive the stock of the corporation, after which he was to give Creel a number of shares of stock with an option to purchase additional shares. Commencing on November 28, 1955, and continuing during the entire existence of the corporation, Clark issued personal checks to various payees for various purposes, which payments were treated on the books of the corporation as advances made to the corporation by Clark. Periodically on the books of the corporation an entry would be made crediting an account called "Advances by Officers" with the aggregate amount of the personal checks drawn by Clark up to the date of said entry. A corresponding debit entry would be made to the "Cash Received" account if the check was payable to the corporation, or to the appropriate corporate expense account if the check was payable to cash or to the order of a third party. Between November 28, 1955, and November 23, 1956, Clark issued checks or caused sums to be paid which totalled $93,403.21. On or about January 5, 1956, the corporation made an *146 application to the Commissioner of Corporations of the State of California for permission to issue 3500 shares of its authorized capital stock for the sum of $35,000. On or about February 29, 1956, the corporation made an entry on its books of account debiting the "Advances by Officers"account in the amount of $35,000 and crediting the "Common Stock" account with an equal amount. The entry was made to record the issuance of 3150 shares of stock to Clark and 350 shares of stock to Creel. The issuance of 350 shares to Creel represented a gift by Clark. As of February 29, 1956, Clark had advanced a total of 38,595.53 to or on behalf of the corporation. Within 2 or 3 months after its organization, Clark became aware that the corporation was losing approximately $10,000 per month. Nevertheless, he continued to make advances to the corporation. As of May 31, 1956, Clark had advanced to the corporation sums totalling $86,125.96. As of May 31, 1956, the books of account showed that Clark had been issued an additional $40,000 worth of stock in payment of his advances to the corporation. Although the books of account stated that an additional $40,000 worth of stock had been issued to Clark, *147 he never received the stock. On August 31, 1956, an entry was made on the corporation's books of account debiting the "Common Stock" account in the amount of $40,000 and crediting the "Loans Payable-Officers" account with an equal amount. The notation accompanying this entry was: "To correctly classify 40,000 [$40,000] loan made by J. Clark." Following this entry, the "Common Stock" account once again had a credit balance of $35,000. The entry to the "Loans Payable-Officers" account was the only entry ever made to that account. The minute book of the corporation indicated that on February 27, 1956, the board of directors authorized the corporation to borrow $25,000 from Clark and to issue its promissory note, payable in 90 days with interest at 4 percent per annum, to evidence said loan. The minute book of the corporation further indicated that on June 11, 1956, the board of directors authorized the corporation to borrow $25,000 from Clark and to issue a promissory note for $15,000, payable in 90 days with interest at 6 percent per annum, and a promissory note for $10,000, payable upon demand with interest at 6 percent per annum, to evidence said loan. Under dates of February 27, 1956, June 11, 1956, and *148 June 11, 1956, the corporation issued to Clark its promissory notes in the amounts of $25,000, $15,000 and $10,000, respectively. All of said notes were signed on behalf of the corporation by Creel, as president, and by Clark, as secretary. The February 27, 1956, note for $25,000 was issued before Clark had actually advanced sums totalling $25,000 to or on behalf of the corporation; [2] the notes of June 11, 1956, for $15,000 and $10,000 were issued after Clark had advanced sums totalling these amounts to or on behalf of the corporation. The only entry on the corporation's books of account evidencing a debt to Clark was made on August 31, 1956. Prior to that date the corporation's books of account reflected Clark's advances in its "Common Stock" account. Although the company lost money from the beginning, Clark believed that it would take approximately 6 months to get the company *149 on its feet and that whatever monies he advanced over and above the cost of the original stock issued "could be covered by notes which would then be repaid as the company worked its way out of the red." On November 16, 1956, the corporation filed a voluntary petition in bankruptcy. In said petition Clark was listed as an unsecured general creditor of said corporation, and his claim was listed in the amount of $50,000. The corporation was adjudicated a bankrupt during 1956. Clark's claim against said corporation was allowed in full by the trustee in bankruptcy. However, after the bankruptcy administration, the trustee had no funds available with which to pay Clark any part of his claim. Prior to the corporation's petition in bankruptcy, Clark had subordinated any claim he may have had against the corporation as a general creditor to the claims of other general creditors who had furnished supplies to the corporation. During the existence of the corporation, Clark drew no salary although he was an officer, director and principal stockholder. Clark exercised very little control over the affairs of the corporation and was not present at its place of business more than 10 or 15 percent *150 of the time. Clark considered his relationship with the corporation to be that of a passive investor. On May 29, 1952, and on August 7, 1952, Clark made loans to Circle Seal in the amount of $2,000 and $1,000, respectively. No security was provided for the loans but Circle Seal did issue demand notes to evidence the indebtedness. Both loans were repaid with interest on May 29, 1954. On April 15, 1953, Clark loaned $1,100 to Jack McClintock, which loan was repaid in 1959. McClintock was an individual with whom Clark had once worked at Lockheed Aircraft Corporation. McClintock needed money to cover personal expenses and, because he knew Clark had been successful in James-Pond-Clark, he approached Clark to borrow the money. On April 30, 1954, Clark loaned $1,625.10 to Bess Ivison, which loan was repaid on April 24, 1957. Bess was the mother of an employee who worked for Clark at James-Pond-Clark. When she was in need of an automobile, her son approached Clark and requested him to advance the funds. On July 1, 1955, Clark loaned $600 to Billy Reed, of which amount only $15 has been repaid. Reed was an entertainer whom Clark had met through Treva J. Myers, a mutual acquaintance. *151 Reed had been fined $600 for an infraction of union rules and requested Clark to loan him money to pay the fine. At the time, Clark was contemplating financing Reed, Treva and Lynn DeRue in a night club act and, therefore, he advanced the money to Reed. On December 8, 1955, Clark loaned $300 to Zip Viracola, which amount has never been repaid. Viracola was a professional football player who came to the Los Angeles area during the winter months in an attempt to secure employment in the movie industry. Viracola needed $300 in order to join the Screen Actors Guild. He was introduced to Clark through Treva; and Clark, upon request, advanced Viracola the money. On November 28, 1955, Clark loaned $2,500 to Creel, of which amount $670 was repaid sometime in 1956. The remainder has never been repaid. The advance to Creel was made at the time when Clark was organizing the corporation. Creel had just recently arrived in Los Angeles and was without funds with which to secure a place to live and an automobile. Since Clark felt that it was necessary for Creel to secure a place to live and an automobile so that Creel would be able to devote his full time to the organization of the corporation, *152 Clark advanced him the needed funds. On February 3, 1956, and March 21, 1956, Clark loaned the amounts of $300 and $50, respectively, to Jerry Sandlin. Of these amounts only $10 has been repaid. On May 7, 1956, Clark loaned $242 to Richard Whit-taker, which amount was repaid to the Mutual Credit Bureau in 1957. Sandlin and Whittaker were both employees of the corporation. Sandlin needed funds to finance a honeymoon and to purchase a television set. Whittaker needed funds to purchase an automobile. At the suggestion of Creel, Clark advanced the needed funds. In August 1956, Clark loaned $200 to Thomas William Cowle. This loan was repaid with interest in August 1957. Cowle was a neighbor of Clark's. During the course of casual conversations, Clark learned that Cowle's automobile needed repairs and that Cowle did not have the necessary funds. Clark, therefore, offered to advance Cowle the money necessary to repair his automobile. In connection with each of the aforementioned loans to individuals, Clark never requested or received security for the advances of funds nor did he ascertain the recipient's credit rating or ability to repay. Between October 17, 1956, and December 3, 1956, Clark *153 advanced the total sum of $6,486.39 to Howlett's Auto Air Conditioning Company of Tucson, Arizona. No part of said advance was ever repaid. Howlett was a former employee of the corporation. After the corporation went bankrupt, Howlett opened an automotive air-conditioning garage in Tucson. The funds advanced by Clark to Howlett were to assist the latter in this endeavor. Originally Howlett intended to incorporate his business, and Clark was to receive 3000 shares of stock by reason of his advances. However, Howlett's business suffered financial difficulty, and it was decided not to spend any additional money on the endeavor; not even to complete the incorporation. Consequently, Clark did not receive the stock he originally anticipated he would receive for his capital contributions. Lynn DeRue and Treva J. Myers were entertainers whom Clark had met at social gatherings and whom he subsequently dated. Through Treva, Clark met Billy Reed who also was an entertainer. Lynn, Treva and Reed were at the time contemplating organizing an act to perform in night clubs and similar places of entertainment. Although he had no prior experience in show business, Clark was interested in providing *154 working capital for such an act. However, the organization of the act never got beyond the talking stage and the entertainment unit was never formed. On October 1, 1954, Clark made a loan in the amount of $1,000 to Treva. An additional loan was made to Treva on May 15, 1955, in the amount of $1,500. As partial consideration for these loans Treva agreed to pay Clark 20 percent of the gross revenue received from any professional appearances by her for a period of 5 years beginning October 1, 1954. The loans to Treva were used by her to purchase costumes needed in her profession and to purchase an automobile. Clark recouped a small part of these loans from subsequent earnings of Treva. On May 27, 1954, Clark made a loan in the amount of $1,000 to Lynn. As partial consideration for this and other assistance, Lynn agreed to pay Clark 10 percent of her earnings from any professional appearances for a period of 10 years beginning June 1, 1954. At the time this loan was made, Lynn was working in the movie industry and needed funds for costumes and similar items. The above-mentioned loans to Treva and Lynn became uncollectible in the calendar year 1956. At no time prior to the year *155 1956 did Clark ever hold himself out to the public as a loan broker or money lender nor had he ever been licensed by any state or municipality to engage in the business of making loans. During the period from 1947 to 1956, Clark was neither engaged in the business of lending money for profit nor engaged in the business of promoting, organizing or managing business enterprises. Opinion Partnership Issue Petitioner Clark contends that the partnership terminated as of December 31, 1955, and, therefore, he is not chargeable with profits earned thereafter by the business; or, in the alternative, that as of January 1956 he was no longer entitled to share in the profits of the partnership and, therefore, should not be held accountable for such profits. After carefully considering the evidence in these proceedings, we believe the record establishes that the partnership was not formally terminated prior to May 31, 1956. As we have previously stated, James and Clark began discussions regarding the dissolution of their partnership in November 1955. The discussions continued for some time, and by the end of November or the early part of December the parties had reached a tentative agreement *156 as to the date of termination and the amount James was to pay Clark for his interest. However, no final action was taken in 1955 to formalize this tentative agreement. In the early part of January 1956, James and Clark met in the office of James' attorney for the purpose of executing the necessary termination documents. At the outset of the meeting, however, James proposed that the partnership be continued until May 31, 1956, in order to afford him additional time to set up corporations to which he intended to transfer the partnership assets. After being assured that it would not cost him anything, Clark agreed to continue the partnership until May 31, 1956. Thereafter Clark and James continued to hold themselves out to the public as partners, executed various leases, contracts and other legal documents as partners and continued to maintain a partnership bank account. Furthermore, it was not until April 25, 1956, that a formal agreement was executed providing for the sale of Clark's interest in the partnership to James, and no actual assignment of Clark's interest was effected until June 1, 1956. In view of the above, we believe that a preponderance of the evidence establishes *157 that the partnership continued in existence until about May 31, 1956. While the partnership may have continued beyond December 31, 1955, we believe there is considerable merit to petitioner Clark's alternative contention that in January 1956 a change in the profit-sharing ratio between the partners took place. [3] Without reiterating the testimony of Clark as to what did, in fact, transpire at the January 1956 meeting, we think it will suffice for us to say that we have been persuaded that following the aforesaid meeting it was agreed by James and Clark that while the partnership was not to be formally terminated, the business itself was to belong to James and that Clark was not entitled to receive the profits earned thereafter. In reaching this conclusion we have also considered the fact that after December 1955 Clark performed no engineering or management duties, received no monthly draw, returned to the company premises only to execute various partnership documents and, what is manifestly clear, did not, in fact, receive any portion of the partnership profits after January 1, 1956. *158 It is well established that partners may adjust between themselves their interest in the earnings of the partnership in any proportion that they may agree upon, and when so fixed they are taxable accordingly. Hellman v. United States, 70 Ct. Cl. 498, 44 F. 2d 83 (1930). See also Raymond R. Goodlatte, 4 B.T.A. 165 (1926). We therefore conclude that Clark had no right to, or interest in, the partnership profits accruing subsequent to January 1, 1956, and that as a result, Clark is not taxable on any portion thereof. We also conclude that James had a 100 percent interest in the partnership profits after January 1, 1956, and is taxable on the full amount thereof. Bad Debt Issue On his income tax return for 1956, Clark deducted the amount of $53,500 as business bad debts. Fifty thousand dollars of this amount represented advances made to or on behalf of Refrig-Rite; $2,500 of this amount represented loans to Treva J. Myers, a professional entertainer; and $1,000 of this amount represented a loan to Lynn DeRue, also a professional entertainer. Respondent contends that Clark's advances to the corporation were contributions to capital and that his advances *159 to Treva and Lynn were nonbusiness debts. In the alternative, respondent argues that the advances to the corporation were nonbusiness debts. Although there is some evidence tending to indicate that Clark's advances to the corporation were more in the nature of capital contributions than genuine loans, for reasons which will soon appear, we have assumed that the advances were bona fide loans. Since the respondent now concedes that the loans to the corporation, Treva and Lynn became worthless to the extent claimed by Clark in 1956, the only issue remaining is whether the bad debts are deductible under section 166(a) of the Internal Revenue Code of 1954[4] as business bad debts or under section 166(d) as nonbusiness bad debts. Section 166(a) provides, "There shall be allowed as a deduction any debt which becomes worthless within the taxable year." However, section 166(d) excludes from the application of section 166(a) any nonbusiness debt, which is defined by negative implication as a debt other than (1) a debt created or acquired in connection with the taxpayer's trade or business; or (2) a debt the loss from the worthlessness of which is incurred in the taxpayer's *160 trade or business. Consequently, if Clark is to have his deduction escape classification as a nonbusiness bad debt, he must prove that the debt was proximately related to a business in which he was engaged. Aubrey S. Nash, 31 T.C. 569, 573 (1958). The issue is one of fact and the burden is on the petitioner. Higgins v. Commissioner, 312 U.S. 212, 217 (1941); Samuel Towers, 24 T.C. 199 (1955), affd. 247 F. 2d 233, (C.A. 2, 1957), certiorari denied 355 U.S. 914 (1958); George A. Butler, 36 T.C. 1097 (1961). Clark's only contention in support of his bad debt deduction is that he was actively engaged in the business of promoting, organizing and financing business enterprises and in making loans, and that the losses claimed on his return were proximately related to said business. A chronological survey of Clark's promotional activities discloses that sometime prior to and during a part of 1947 he was employed as a manufacturing superintendent for the Burlake Manufacturing Company and during that period had *161 no other occupation. In June 1947 Clark became a partner in James-Pond-Clark, a valve manufacturing company, and until November 1955 devoted 100 percent of his time to the partnership. In 1952 Clark became a partner in Circle Seal, a manufacturers' sales organization, but aside from contributing capital to the venture it is apparent that Clark did not actively participate in the affairs of this company. In December 1955 Clark organized and financed Refrig-Rite, a corporation which engaged in, among other things, the automotive air conditioning business. Although Clark was an officer, director and principal stockholder of the corporation, he exercised very little control over its affairs and was not present at its place of business more than 10 or 15 percent of the time. Clark considered his relationship with the corporation to be that of a passive investor. During the period between 1948 and 1956 Clark invested heavily in oil-well drilling ventures. However, he was not personally active in the business of the particular drilling ventures. It is well settled that the right to deduct bad debts as business losses is applicable only to the exceptional situation where the taxpayer's activities *162 in promoting, financing, managing and making loans to a number of business organizations and/or individuals have been regarded as so extensive and continuous as to elevate that activity to the status of a separate business. Max M. Barish, 31 T.C. 1280, 1286 (1959); H. Beale Rollins, 32 T.C. 604, 613 (1959), affd. 276 F. 2d 368 (C.A. 4, 1960); Charles G. Berwind, 20 T.C. 808, 815 (1953), affd. per curiam 211 F. 2d 575 (C.A. 3, 1954). From the record it is clear that with the exception of his participation in the James-Pond-Clark partnership, Clark's activities with regard to the oil-well drilling ventures, Circle Seal and Refrig-Rite were of a passive nature and as such hardly furnish a basis for classifying him as one who was in the business of promoting, financing and managing business enterprises. We conclude, therefore, that the facts of this case are not sufficient to justify the exceptional treatment allowed by the decisions in Henry E. Sage, 15 T.C. 299 (1950); Vincent C. Campbell, 11 T.C. 510 (1948); and Glenn E. Alexander, 34 T.C. 758 (1960). Turning now to Clark's *163 contention that he was in the business of lending money, the record shows that with the exception of the 3 loans to Refrig-Rite, a corporation in which Clark was the majority stockholder, during the period between 1952 and 1956 Clark had made only 15 loans totalling $19,903.49 to 12 borrowers. Two of these loans were to a partnership in which petitioner was a member, 1 loan was made to an individual with whom Clark had previously worked and apparently counted as a friend, 1 loan was made to the mother of one of Clark's employees at James-Pond-Clark, 3 loans were made to employees of Refrig-Rite, 6 loans were made to friends, 1 loan was made to a neighbor of Clark's, and 1 loan was made to a former employee of Refrig-Rite. In each instance, the recipient sought out Clark to request the loan, and in each instance Clark did not check the credit rating of the borrower or require security for the loan. Considering the small number of loans and the fact that petitioner did not hold himself out to the public as a lender of money, made loans only to firms or individuals with whom he had business or social attachments, made no attempt to secure credit references or collateral to safeguard *164 his loans, and during the years 1948 to 1955 admittedly devoted 100 percent of his time to the activities of the James-Pond-Clark partnership, it is apparent that the evidence does not bespeak of an individual engaged in the separate and distinct business of lending money. See Max M. Barish, supra; Estate of William P. Palmer, Jr., 17 T.C. 702 (1951); Rudolf A. Zivnuska, 33 T.C. 226 (1959). Consequently, we hold that Clark has not sustained his burden of showing that the claimed losses of $53,500 in 1956 were business bad debts within the meaning of section 166(a). Decision will be entered for respondent in Docket No. 91432. Decision will be entered under Rule 50 in Docket No. 92499. Footnotes
1. Restricted to Docket No. 92499.↩
2. As of February 29, 1956, Clark had advanced a total of $38,595.53 to or on behalf of the corporation. Of this sum $35,000 reflected the cost of Clark's stock in the corporation. Consequently, at the time the $25,000 note was issued, Clark had only advanced an additional $3,595.53 to the corporation.↩
3. Although the partnership agreement originally provided, in part, that the profits were to be shared on an equal basis, parol evidence was admissible to show that the partners at some later date amended this provision of the partnership agreement. Piatt's Administrator v. United States, 89 U.S. 497, 506↩ (1874); 32 C.J.S., sec. 1004, p. 1008.
4. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954.↩