H. GILBERT SEALY ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Sealy v. Commissioner
Docket Nos. 4518-77, 4519-77, 4542-77, 4737-77.
United States Tax Court
T.C. Memo 1980-7; 1980 Tax Ct. Memo LEXIS 578; 39 T.C.M. (CCH) 847; T.C.M. (RIA) 80007; January 14, 1980, Filed John Robert King, for the petitioners. M. Alice Gresham, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge Respondent determined deficiencies in petitioners' income tax for the *582 years and in the amount as follows: Addition to Tax
Sec. 6653(a)
Retitioner
Year
Deficiency
I.R.C. 1954 [2]
Petro-Chem Technical
Ending
Services, Inc.
2-28-73
$12,093 $605
Petro-Chem Technical
Ending
Services, Inc.
2-28-74
13,766
688
Fred T. and Lorraine
Calendar
King
Yr. 1972
3,459
173
Fred T. and Lorraine
Calendar
King
Yr. 1973
6,206
310
H. Gilbert Sealy
Calendar
Yr. 1972
5,695
285
H. Gilbert and
Calendar
Mary E. Sealy
Yr. 1973
7,520
376
Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision the following: (1) Whether amounts expended by Petro-Chem Technical Services, Inc. (Petro-Chem), during its fiscal year ending February 28, 1973, and February 28, 1974, in connection with deer hunts and maintenance expenses, insurance and depreciation of a recreational vehicle used to house some of the hunters, constitute ordinary and necessary business expenses under section 162, and, if so, whether any of these items *583 has been substantiated as required by section 274(a) and (d); (2) whether expenditures by Petro-Chem for its fiscal years 1973 and 1974 for contract services, advertising, automobile and truck maintenance, insurance, and living and travel expenses to the extent disallowed by respondent are deductible as ordinary and necessary business expenses pursuant to section 162, and whether the living and travel expenses are substantiated under section 274; (3) whether any of the payments made by Petro-Chem for the above listed expenses constitute constructive dividends to either of the corporation's 50 percent shareholders; (4) whether Peter-Chem is entitled to deductions for depreciation with regard to equipment, office furniture and a truck, and for salaries and payroll tax in excess of the amounts allowed by respondent; (5) whether H. Gilbert Sealy engaged in hourse farming as a profitmaking activity in the calendar years 1972 and 1973 so as to be entitled to deduct the loss incurred in this activity; (6) whether respondent's adjustments to the interest income and salary of H. Gilbert Sealy for the calendar year 1973 are proper; (7) whether Fred T. and Lorraine King properly reported on their *584 joint Federal income tax return for each of the years 1972 and 1973 gross receipts, operating expenses, and depreciation relating to their motel operation; (8) whether Fred T. and Lorraine King are entitled to deductions for 1972 and 1973 relating to properties held for rental purposes in excess of the amounts allowed by respondent; and (9) whether any part of any underpayments of tax by each petitioner was due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). FINDING OF FACT Some of the facts have been stipulated and are found accordingly. Petro-Chem, a corporation which had its principal place of business in Houston, Texas, at the time of filing its petition in this case, filed its Federal income tax returns for the fiscal year ending February 28, 1973 (fiscal year 1973), and February 28, 1974 (fiscal year 1974), with the Internal Revenue Service Center, Austin, Texas. Petitioners Fred T. King (King) and Lorraine King, husband and wife, who resided in Pasadena, Texas, at the time of filing their petition in this case, filed joint Federal income tax returns for the calendar years 1972 and 1973 with the Internal Revenue *585 Service Center, Austin, Texas. Petitioner H. Gilbert Sealy (Sealy), who resided in Pasadena, Texas, at the time of filing his petition in this case, filed his individual Federal income tax return for the calendar year 1972 with the Internal Revenue Service Center, Austin, Texas. In July 1973 Sealy married. Sealy and his wife, Mary Sealy, filed a joint Federal income tax return for the calendar year 1973 with the Internal Revenue Service Center, Austin, Texas. At the time of filing their petition in this case, Mr. and Mrs. Sealy resided in Pasadena, Texas. Petro-Chem is a closely held corporation in the business of supplying personnel to those oil companies starting oil refineries and chemical plants in the United States and in foreign countries. King and Sealy are each 50 percent shareholders of Petro-Chem. In 1972 and 1973 King and Sealy spent 20 percent of their work time in attempts to attract new business for King in attempts to attract new business for Petro-Che; the remaining 80 percent of the time they sought qualified personnel to act as consultants to the corporation's clients. Petro-Chem encountered difficulties in attracting qualified American workers willing *586 to deal with the hardships of working in foreign countries. The corporation advertised available employment positions in major United States newspapers, but few qualified workers applied. King and Sealy found that the Petro-Chem consultants primarily were attracted from ship channel industires. Over the years the company developed a network of people to provide names of possible workers, including retirees and persons seeking to leave jobs in the ships channel industries. Armed with names of potential candidates, King and Sealy personally would approach those people and attempt to convince them of the benefits of working for Petro-Chem. Because of the hiring diffiiculties, Sealy and King determined that in a secluded entertainment situation they could establish a rapport with persons who might have information as to prospective employees and persuaded persons seriously considering accepting employment with Petro-Chem of the advantages of such employment. As a result, Petro-Chem leased deer hunting rights from H. H. Mueller in Bandera, Texas, which lease included 400 acres of land. That deer lease entitled the corporation to bring ten different guest hunters onto the land per *587 year. The State Game and Wildlife Department of Texas required Petro-Chem to maintain at the deer lease site a logbook indicating the name of each hunter, his hunting license number, his signature, and the type of deer killed, if any. At the end of each season, Mr. Mueller collected the logbook and sent it to the State Game and Wildlife Department. No other record was kept of the guest hunters' names. A two bedroom farmhouse, located on the deer lease, provided limited bed space to the corporation's guest hunters. To supplement that sleeping facility Petro-Chem acquired a recreational vehicle. During the non-hunting season, that recreational vehicle was parked in a commercial mobile trailer storage lot in the Gulfgate area of Houston. Petro-Chem incurred costs related to the company's attraction of potential employees and maintenance of the deer lease, including: Fiscal Year
Fiscal Year
Expenses
1973
1974
1. Advertising $ 600.00
2.Entertainment
1,876.00
$3,348.00
Expense
3. Depreciation on
1,654.00
2,770.00
recreational
vehicle
4. Auto and Truck
199.99
Expenses
5. Deer lease supplies
(a) W. W. Grainger
115.45
(b) Bergmann Lumber
33.64
Company
(c) W. W. Davenport
315.00
(d) Pearland Butane
50.30
(e) K-Mart
67.00
*588 Petro-Chem claimed these amounts as deductible on its Federal income tax returns for its fiscal years 1973 and 1974. Respondent in his notice of deficiency disallowed these claimed deductions, explaining that the amounts had not been shown to be ordinary and necessary business expenses and had not been substantiated as required by section 274. During 1972, 1973 and 1974, Petro-Chem rented two automobiles for the business use of King and Sealy. Petro-Chem paid rental fees on these automobiles of $5,650 and $6,790 in fiscal years 1973 and 1974, respectively. Although both King and Sealy owned personal automobiles of comparable quality to those rented, each of them drove the rented vehicles between home and work on a daily basis. Petro-Chem claimed the rental fees paid as a deduction on its Federal income tax returns for the fiscal years 1973 and 1974. Respondent in his notice of deficiency disallowed 25 percent of the claimed deduction for each year. King and Sealy each held corporate charge cards with several oil companies during the fiscal years 1973 and 1974. Petro-Chem paid these oil companies for gasoline and servicing charges the amounts of $4,258.23 and $4,226.63 *589 in its fiscal years 1973 and 1974, respectively, and claimed these payments as deductible expenses.Respondent disallowed $2,273.71 and $1,928.82 for the fiscal years 1973 and 1974, respectively, of these claimed deductions as amounts paid for gasoline used personally by Sealy and King. Petro-Chem made numerous payments by check in its fiscal years 1973 and 1974 related to living and travel expenses. The amounts expended included: (1) In its fiscal year 1974, a payment to Nick Commiato d/b/a Gulfgate Travel in the amount of $110; (2) American Express payments totaling $1,189.98 and $612.21 in its fiscal years 1973 and 1974, respectively; (2) payments to Vernon Cantrell for $527 in the fiscal year 1973; and (4) payments to Southwest Airlines of $70 on April 10, 1972, and $180 on March 7, 1973. These amounts, which were included in the deductions claimed by Petro-Chem on its Federal tax returns, were disallowed as being payments for the personal benefit of Petro-Chem stockholders and not deductible expenses of the corporation. Petro-Chem, in its fiscal years 1973 and 1974, paid by check numerous individuals for services. Amongst the checks issued in payment for those contract *590 services were the following: Fiscal Year 1973 Contract Services
Payee
Amount
L. (or L. E.) Marchant
$1,221.17
W. (or Westanna) Vercher
1,885.00
Bobby Owens
2,000.00
J. G. McHaney
750.00
T. C. (or Tommy) Jones
150.00 [plus
150.00 cash]
Dennis Fogarty
625.00
J. Sibarium
900.00
Fiscal Year 1974 Contract Services
Payable
Amount
L. (Or L. E.) Marchant
$2,385.50
W. (or Westanna) Vercher
2,850.00
J. (or J.O) Harper
1,263.00
Ronald Buck
500.00
L. C. Massey
600.00
R. D. Faurie
578.00
Dennis Fogarty
725.00
W. R. Crow
1,785.00
Mate Baker
205.00
J. Murray
1,200.00
T. B. (or Tom) Chaney
152.06
Byron sanders
600.00
Rob Stevens
409.20
Langford's
79.07
Wayne Burnett
248.59
C. Hoy
355.00
P. Lowry
100.00
These amounts were included in the deductions claimed by Petro-Chem on its Federal tax returns for its fiscal years 1973 and 1974. Respondent disallowed the claimed deductions on the basis that the payments were not business expenses of Petro-Chem but were payments made for the personal benefit of its stockholders. Petro-Chem paid insurance costs during its fiscal years 1973 and 1974 including, inter *591 alia, insurance on the recreational vehicle, automobile insurance on the rented vehicles, medical insurance, and automobile insurance premiums paid to Texas Farmers Insurance Co. totaling $698.66 and $861 in its fiscal years 1973 and 1974, respectively. The deduction claimed by Petro-Chem for insurance paid included the total amounts paid for the items listed above. Respondent disallowed 25 percent of the insurance payments claimed on the automobiles leased for Sealy and King, the insurance claimed on the recreational vehicle, a portion of the medical insurance paid, and the premiums paid to Texas Farmers, Inc., with the explanation that these payments were for the personal benefit of Petro-Chem's stockholders and not properly deductible as business expenses by Petro-Chem. During those same years King and Sealy made several purchases from the following organizations and individuals, which amounts were paid by Petro-Chem and charged to the corporate supplies account: Fiscal Year 1973
Payee
Amount
Olshan's
$436.30
Sears, Roebuck and Company
125.49
Bandera County Ranch
257.45
Fiscal Year 1974
Mary Carter Paint
$ 13.99
Sears, Roebuck and Company
315.44
Langford's Well Service
663.60
*592 Petro-Chem paid by check numerous vehicle expenses during its fiscal years 1973 and 1974. Included amongst those expenditures were the following: Fiscal Year 1973
Payee
Amount
A. C. Collings Ford $ 76.46
Bland Willis Cadillac
73.70
Shackelford's Garage
183.92
International Harvester
326.66
Firestone
237.97
Harrison Equipment
1,169.17
Bob Dues Camper
18.78
Don Morrison
49.00
Fiscal Year 1974
Payee
Amount
Sears, Roebuck and Company
$ 37.78
Shackelford's Garge
162.21
A. C. Collins Ford
108.69
These amounts, which were included in deductions claimed by Petro-Chem on its returns, were disallowed by respondent as being personal expenses of Sealy and King rather than business expenses of the corporation. Petro-Chem determined depreciation for its fiscal years 1973 and 1974 on a 1972 Chevy pickup truck in the amounts of $1,912 and $957, respectively. That pickup truck was reported by the corporation as having been used as a trade-in against a new truck purchased in March 1972. Respondent in his notice of deficiency disallowed $28 of the depreciation claimed by Petro-Chem on the truck which was traded in and disallowed *593 $38 on the depreciation claimed by Petro-Chem for its fiscal year 1974 on capeting and office furniture. An accountant devised the Petro-Chem bookkeeping and financial systems at the time of its incorporation in 1968. Under this system King and Sealy were not to be paid a determinable salary, but a "draw account" was established for each. Theoretically under the system as company checks were issued by Petro-Chem in payment for personal acquisitions and expenditures by either King or Sealy, the bookkeeping service would credit the appropriate draw account with the moneys paid. The structure of this accounting system was not changed before or during the years here at issue. However, some time during 1973 the Petro-Chem Board of Directors authoized a salary for King of $31,500. On February 28, 1973, the end of the corporate 1973 fiscal year, the Petro-Chem financial journal reflected King's salary as $32,500.
During the calendar yars 1972 and 1973 Fred T. and Lorraine King owned three properties, located in Pasadena, Houston, and Kemah, Texas, in addition to their personal home.Moreover, during those years Mrs. King operated a motel business. In 1972 and 1973 each property *594 required maintenance, including but not limited to roof repairs, domestic services, and replacement gutters. During 1972 the Kemah, Texas, property was to some extent renovated by the labors of King's brother-in-law, C. A. Myers (Myers), who lived in the house rent-free uring part of 1972. After some improvements to the property had been made, Myers remained in the home and he paid a total of $125 rent for approximately three or four months in 1972. Myers continued to live in the house for a part of all of 1973. The total rental received by King from the house in 1973 was $525. Mr. and Mrs. King reported on their Federal income tax returns gross receipts of $10,069 and $10,474 in the calendar years 1972 and 1973, respectively, from the operation of a motel in Kemah, Texas. Respondent determined that gross receipts from the motel operation amounted to $10,022 in 1972 and $11,626 in 1973. Respondent in his notice of deficiency also disallowed $1,904 of the $6,529 and $1,384 of the $7,608 claimed as motel operating expenses in 1972 and 1973, respectively. The Kings deducted on their Federal income tax returns depreciation on their motel property of $518 in 1972 and $390 in *595 1973. Respondent in the notice of deficiency determined the proper amounts to be $117 and $299, respectively. Petitioners claimed rental losses in 1972 and 1973 of $3,670.57 and $4,801, respectively.Respondent in his notice of deficiency determined those rental losses to be $2,140 in 1972 and $1,050 in 1973. In making his determination respondent allowed no loss deduction on the 509 Kipp Street, Kemah property with the explanation: With regard to the house at 509 Kipp Street, you were not truly renting this property, therefore the net losses of $465.72 in 1972 and $1,831.00 in 1973 are not allowed. This property has not been held for the production of income. In April 1972, Sealy purchased a ten acre farm near San Antonio in Bandera, Texas. At the time of purchase the farm was located across the street from Loss Valley Downs, a functioning race track which subsequently closed. During 1972 and 1973 Sealy supported approximately three to five horses on his farm. Sealy hired a ranch foreman during 1972 to handle the daily farm affairs. In 1972 and 1973 professional trainers prepared several of the horses for racing. Because the stallion was raced in 1972, it was not used *596 for breeding purposes at that time. After acquisition of the farm Sealy constructed a barn, and subsequently, in 1973 he added stalls thereto. During either 1973 or 1973 Sealy purchased both a horse trailer to transport the horses to and from race tracks and a tractor. Also during those years Sealy became became a member of the American Quarterhorse Association. Upon the realization of monetary losses in 1972 and 1973 from the farm, Sealy fired the foreman and ceased horse racing. He fed the mares solely on pasture grasses and leased the mares to a third party for breeding purposes. By 1975 Sealy was realizing a small profit on the farm operation. [3]
On his 1972 Federal income tax returns Sealy claimed a farm loss of $6,662 computed as follows: Income
Sale 1 colt $ 450
Horse show prize
350
Total $ 800
*597 Deductions
Labor hired $ 600
Interest
766
Feed purchased
950
Veterinary
249
Taxes
49
Insurance
201
Utilities
219
Horse training fees
1,500
Depreciation
2,928
Total
$7,462
On their 1973 joint Federal income tax return Sealy and his wife claimed a farm loss of $7,616 computed as follows: Income $0
Deductions
Labor hired
600
Repairs
555
Interest
855
Feed purchased
952
Veterinary
247
Taxes
49
Insurance
524
Utilities
217
Horse training fees
1,500
Mileage
110
Depreciation
2,007
Total
$7,616
Respondent in his notice of deficiency disallowed the amounts in their entirety as farm losses, but allowed the interest and taxes paid (increasing these claimed amounts in 1973) as interest and tax deductions under sections 163 and 164, respectively. Respondent in his notice of deficiency to the Sealys for 1973 disallowed $70 of the deduction claimed for interest income. The following schedules show the amounts claimed for certain deductions by Peter-Chem for its fiscal years 1973 and 1974, and the amounts of these claimed deductions disallowed by respondent.
Fiscal Year 1973
Deductions
Amount
Claimed
Disallowed
by
by
Petro-Chem
Respondent
Payroll taxes
$ 21,640
$1,000
Contract services
9,598
8,745
Living and travel
192,230
1,787
expenses
Auto and truck
13,998
5,869
expenses
Insurance expenses
19,426
699
Entertainment
1,157
1,157
expenses
Advertising
1,401
600
expenses
Depreciation
5,034
1,506
Supplies expenses
3,200
1,283
Officers salaries
65,000
1,000
*598 Fiscal Year 1974
Deductions
Amount
Claimed
Disallowed
by
by
Petro-Chem
Respondent
Contract services
$ 20,409
$15,197
Living and travel
expenses
128,228
902
Auto and truck
14,816
3,935
expenses
Insurance expenses
14,083
861
Entertainment
4,042
3,348
expenses
Depreciation
6,023
3,207
Supplies expenses
3,553
1,110
Respondent determined that a number of the payments made by Petro-Chem during its fiscal years 1973 and 1974 which he disallowed were not company-related expenditures but were paid for personal items of either King or Sealy. Petro-Chem had not charge these payments against the draw accounts of either Sealy or King. Respondent in his notice of deficiency determined that these payments made by Petro-Chem of personal items of King and Sealy were dividend income to Sealy and King. The following schedules show the amounts determined by respondent to be dividend income to King and Sealy from Petro-Chem because of the above-mentioned payments of personal items: Fred T. King, Jr.
Calendar
Calendar
Nature of Payment
Year 1972
Year 1973
Payroll taxes $ 500 $ 0
Contract services
2,930
7,056
Living and travel expenses
278
0
Auto expenses
1,687
1,451
Medical and auto insurance
267
295
Entertainment expenses
92
0
Supplies
436
0
Salary in excess of
0
1,000
authorized amount
Total dividends
$6,190
$9,802
*599 H. Gilbert Sealy
Calendar
Calendar
Nature of Payment
Year 1972
Year 1973
Payroll taxes $ 500 $ 0
Contract services
4,968
6,457
Living and travel expenses
263
414
Auto expenses
2,141
2,403
Medical and auto insurance
125
259
Entertainment expenses
0
144
Supplies
184
1,192
Depreciation
223
0
Cash withdrawal from bank
0
2,000
Total dividends
$8,404
$12,869
OPINION The expenditures of Petro-Chem relating to entertainment, automobile and truck, depreciation, insurance, deer lease supplies, contract services, advertising, and living and travel qualify as deductible items only if shown to be "ordinary and necessary" business expenses. Section 162(a). Moreover, all expenditures for entertainment and payments relating to a facility used in connection with entertainment must meet the further requirements of proper substantiation under section 274(d). Traveling expenses also require substantiation under section 274(d) to qualify as deductible.
Respondent argues that his disallowance of a portion of Petro-Chem's claimed deductions should be sustained since these claimed deductions do not satisfy the "ordinary and necessary" requirement *600 of section 162. He contends that some of the amounts of claimed deductions which he disallowed were payments of personal expenses of Petro-Chem stockholders rather than "ordinary and necessary" business expenses of Petro-Chem. He further argues that other portions of the claimed deductions which satisfy the requirements of section 162 are properly disallowed because they lack adequate substantiation under section 274. Respondent contends that these disallowed items constitute dividends to the stockholders which are not deductible by the corporation. The first issue is whether expenditures claimed by Petro-Chem for entertainment, automobile and truck expenses, depreciation, and deer lease supplies constitute ordinary and necessary business expenses, and how much, if any, of those amounts has been substantiated under section 274 and the regulations issued pursuant thereto.Section 162(a) provides for the deduction of all ordinary and necessary expenses paid or incurred in carrying on a trade or business. However, certain amounts which qualify as deductions under section 162 are not allowable unless the substantiation requirements of section 274 are met. The Supreme Court in *601 Welch v. Helvering,290 U.S. 111, 113 (1933), gave meaning to "ordinary and necessary" expenses. The Court indicated that "necessary," as used in the predecessor of section 162(a), means "appropriate and helpful" in "the development of petitioner's business." Whether an expenditure is "ordinary and necessary" is a factual determination. Commissioner v. Heininger,320 U.S. 467 (1943). Respondent argues that the expenses incurred by Petro-Chem for entertainment, deer lease supplies, and other related expenditures, including automobile and truck expenses and depreciation were neither ordinary nor necessary. We are of the contrary opinion. Without the deer lease to entertain prospective employees and persons potentially willing to provide names of possible employment candidates, Petro-Chem would have found it more difficult to obtain the employees it needed in its business. The sole function of Petro-Chem is to provide qualified consultants to oil companies starting refineries and chemical plants in the United States and abroad. Petro-Chem found the deer lease to be most beneficial in enabling it to hire sufficient numbers of qualified consultants. *602 In some years when Petro-Chem did not have the deer lease, it had been forced to refuse business contracts because of lack of persons qualified to act as consultants to its clients. Petro-Chem found that during the time that it maintained the deer lease, it was able to attract sufficient numbers of qualified workers to fulfill its contract commitments. In your view this record shows that the entertainment expenses related to the deer lease were helpful and appropriate in Petro-Chem's business. Similarly, the expenses incurred including the insurance premiums, storage payments, and depreciation related to the recreational vehicle were ordinary and necessary business expenses. Petro-Chem acquired the recreational vehicle to provide adequate sleeping facilities for quest hunters. Without the recreational vehicle only a few of the guest hunters would have been able to remain at the site of the deer lease overnight, and therefore the effectiveness of courting a capture audience would have been lost to Petro-Chem.We conclude that the Petro-Chem expenditures were not made primarily for personal or social purposes, and furthermore, there existed a proximate relationship between the *603 claimed expenditures and the corporate business. Sholund v. Commissioner,50 T.C. 503, 508 (1968). However, certain deductions allowable under section 162(a) are not to be allowed unless the provisions of section 274 are met. Section 274(a) limits deductions allowable for traveling expenses, entertainment, amusement, recreation, or items with respect to a facility used in connection with those activities [4] to expenditures which satisfy the substantiation requirements as set out in section 274(d). This section provides: *604 (d) Substantiation Required.--No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. The Income Tax Regulations promulgated pursuant to section 274 have *605 been uniformly approved by the courts. Dowell v. United States,522 F.2d 708 (5th Cir. 1975); Andress v. Commissioner,51 T.C. 863 (1969), affd. without discussion 423 F.2d 679 (5th Cir. 1970). Section 1.274-5(b), Income Tax Regs., provides that no deduction is allowed for entertainment or traveling expenses unless a taxpayer establishes the amount, time and place, business purpose, and the business relationship of the person entertained for each separate expenditure.[5] The rules for substantiating each of the elements of each expenditure as required by section 1.274-5(b) are listed in section 1.274-5(c), Income Tax Regs.[6]
*606 Section 1.274-5(c), Income Tax Regs., necessitates adequate written records made contemporaneously to the expenditure; absent that, the substantiation requirement may be satisfied upon a taxpayer's providing detailed statements with respect to the expenses coupled with corroborative evidence, such as the testimony of a party entertained. Entertainment outlays are directly related to business only if at the time incurred the taxpayer had more than a general expectation of deriving income or other specific business benefit; business discussions or meetings were actively engaged in during the entertainment period (or at the time of the expenditure, the taxpayer reasonably expected to engage in such business discussions but was unable to do so for reasons beyond his control); the principal character of the combined business and entertainment was the active conduct of taxpayer's business; and the exense was allocable to the taxpayer and person from whom the business benefit was expected. [7]
*607 Section 1.274-5(c)(6)(iii), Income Tax Regs., provides the substantiation rules governing the deductibility of items with respect to a facility, provided that the facility is used primarily (more than 50 percent of the time) to further the taxpayer's business. [8] Thereunder, to establish the primary use of the facility, a taxpayer must provide adequate records as to amounts, time of usage, business purpose, and business relationship with persons entertained. Otherwise a presumption arises that the facility's use is primarily personal. *608 Petro-Chem asserts that it has complied with section 274, particularly the substantiation requirements specified in section 274(d). While the corporation concedes that it does not satisfy the adequate records provision of section 1.274-5(d)(1) and (2), Income Tax Regs., it contends that those records submitted into evidence coupled with testimony of the corporation's president and vice president and the corroborating testimony of a third party suffice under section 1.274-5(c)(3), Income Tax Regs., as appropriate verification. We have reviewed the record in detail, and conclude that Petro-Chem did not comply with the requirements of section 274(d) and the regulations issued pursuant thereto. The intent of Congress in enacting section 274(d) was to prohibit the allowance of deductions based upon the self-serving testimony of a taxpayer. S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 741; Ashby v. Commissioner,50 T.C. 409, 415 (1968). Where a taxpayer provides imprecise information and also fails to give specific corroborating evidence to establish each statutory element--amount, time, place and purpose of each expenditure--that *609 taxpayer will not be allowed a claimed deduction. Dowell v. United States,522 F.2d 708, 714 (5th Cir. 1975); Rutz v. Commissioner,66 T.C. 879, 883-884 (1976). Petro-Chem failed to maintain adequate and detailed records with respect to entertainment. It claimed deductible entertainment expenses of $1,876 and $3,348 in its fiscal years 1973 and 1974, respectively. Respondent disallowed those amounts in full. The only written record of those persons entertained at the deer lease was in the form of a logbook for the State Game and Wildlife Department of Texas. The logbook listed the name of each hunter, his hunting license number, his signature, and the type of deer killed, if any. That logbook was not presented into evidence. The officers of Petro-Chem stated that they were unable to acquire it from the State. Petitioners did introduce into evidence a list of those persons Sealy and King thought were guest hunters during the years in issue. That list was prepared at the time Petro-Chem's tax returns for its fiscal years 1973 and 1974 were audited by a revenue agent. Their testimony indicated that business was discussed with several of *610 the enumerated people, but exact dates could not be remembered, nor were discussions recalled in detail with respect to all guests listed on the document prepared several years after the years in issue. The testimony of each King and Sealy in addition to the testimony of the "corroborating witness" for Petro-Chem was not strong enough to provide the degree of substantiation required to support an entertainment expense deduction. In fact the "corroborating witness" did not corroborate the testimony of King or Sealy. [9]
*611 The evidence indicates that not over 10 to 12 hunters could be taken onto the lease during each hunting season. However, the list of hunters who Sealy and King thought were entertained at the deer lease each year consisted of about twice the allowable number. The list did not indicate which persons, if any, attended the hunts each year, or the particulars of the business discussions which took place. There is some indication in the record that turkey hunts may also have been held at the deer lease and some of the hunters may have been only on turkey hunts. However, if turkey hunts were held, no evidence clearly shows which persons attended or the dates of the hunts.In fact it is not shown that the 10 to 12 hunters per season referred only to deer hunters. We are of the opinion that Petro-Chem's recreational vehicle was used in connection with its business, and that operating expenses (including amongst other items $110 of storage and $278 annually for insurance) in addition to depreciation were incurred in association therewith. However, to deduct those items section 274 requires that the facility be used "primarily for the furtherance of the taxpayer's trade or business". *612 Primarily means more than 50 percent. Section 1.274-5(c)(6)(iii), Income Tax Regs., requires that a taxpayer maintain detailed records, including cost, date, number of persons entertained, nature of entertainment, mileage and other helpful information in establishing a facility's primary use. Petro-Chem made no showing of the use, if any, to which the vehicle was put when it was not being used at the hunts. The only evidence indicates the place where the vehicle was kept in Houston during the non-hunting season. Because Petro-Chem has not provided adequate records or other sufficient evidence of the nature required to substantiate that the recreational vehicle was used primarily for business, we apply the presumption that the facility's usage was primarily personal. Accordingly, those expenses related to the recreational vehicle are not deductible. While we do not doubt that the deer lease was used in Petro-Chem's business, petitioners have failed to establish that the deer lease was used primarily for business purposes as required by section 274. Adequate records as required by section 1.274-5(c)(6)(iii), Income Tax Regs., were not maintained, and therefore Petro-Chem *613 has not overcome the presumption that the facility was used primarily for personal purposes. The consequent result is that those operating expenses related to the deer lease, specifically payments for supplies to W. W. Grainger, Bergmann Lumber Company, W. W. Davenport, Pearland Butane, and K-Mart, are not deductible. The second issue for our consideration is whether expenditures claimed by Petro-Chem for contract services, advertising, automobile and truck maintenance, and living and travel, were deductible as ordinary and necessary business expenses under section 162, and whether the living the travel expenses were properly substantiated under section 274(d). Concurrently we examine the issue of whether any of those expenditures constitutes constructive dividends to King or Sealy. Petro-Chem incurred $600 of advertising costs in its fiscal year 1973 which was listed by the parties as an expense of the deer lease. However, the record shows that the amount expended included an advertising campaign in major newspapers throughout the United States directed at attracting qualified persons for consultant positions with Petro-Chem. Such advertising is a common method of notifying *614 the public of the availability of employment opportunities. Often times it proves an appropriate and helpful means of soliciting work applicants. Therefore, in our view, the amount of $600 to advertising costs was an ordinary and necessary expense incurred in carrying on the business of Petro-Chem. Advertising expenses are not required to be substantiated in accordance with the requirements of section 274. This record contains adequate substantiation of the $600 expenditure, and we hold that this $600 is properly deductible by Petro-Chem as a business expense.
Petro-Chem claimed deductions for expenditures for contract services in the amounts of $9,598 and $20,409 in its fiscal years 1973 and 1974, respectively. Respondent decreased the amount of the deductions claimed by $8,745 and $15,197 for each of those years, respectively. Respondent contends that the amounts disallowed are not ordinary and necessary business expenses, but rather payments of personal expenses of its shareholders which had no proximate relation to Petro-chem's business. The testimony of each shareholder of Petro-Chem shows that many of the contract services in issue were rendered to the shareholders *615 for their personal purposes, including the roofing of King's rental properties, maid service in King's home and motel operations, repairing gutters on King's rental units, and payments to Sealy's horse trainer as well as his foreman. Additionally, $600 worth of checks were issued to L. C. Massey in fiscal year 1974. The evidence indicates that those payments to L. C. Massey were made solely in furtherance of Petro-Chem's attracting qualified workers, and consequently those aomounts are deductible business expenses. A number of other items were not verified as having been rendered to the corporation for business purposes, and for this reason we conclude that those payments were also made to benefits King or Sealy personally. Therefore, we are of the opinion that excepting the payments to L. C. Massey, those expenditures for contract services were for the personal economic benefit of either King or Sealy, and as such, Petro-Chem is not entitled to a business expense deduction. It is a well established rule that corporate payments made on behalf of its shareholders to third parties may constitute dividends taxable to those shareholders. American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1115 (1957), *616 affd. 262 F.2d 150 (9th Cir. 1958); Paramount-Richards Theatres, Inc. v. Commissioner, 153 F.2d 602 (5th Cir. 1946), affirming a Memorandum Opinion of this Court.Under sections 301 and 316 distributions from earnings and profits shall be dividends. The fact that the Petro-Chem financial systems provided for the ascertainment of compensation after profits became fixed at year end indicates that the payments were distributions of earnings and profits. There certainly was no connection between the work performed by King or Sealy and the amount paid on their behalf to third parties. King and Sealy have not shown that the payments made by Petro-Chem which economically benefitted them were not distributed from the corporation's earnings and profits. We hold that King and Sealy each received taxable dividend income from payments for contract services on their behalf by Petro-Chem.
During its fiscal years 1973 and 1974 Petro-Chem paid gasoline and service charges to oil companies in the amounts of $4,258.23 and $4,226.63, respectively. Petro-Chem also incurred other automobiel and truck expenses which respondent determined were not properly deductible as *617 ordinary and necessary business expenses. Numerous gasoline charge slips on Petro-Chem's cards were signed by Mrs. King. Signatures on other charges were made by unidentified persons who signed King's or Sealy's names. King testified that Mrs. King never drove the company automible for her personal purposes, but he confirmed that she did use the company charge card at times. King argues that each time Mrs. King used the Petro-Chem oil credit cards she was servicing the company car to accommodate King's busy schedule. Given the quantity of Petro-Chem's gasoline charge slips signed by Mrs. King, we conclude that the majority of those charges were not for gasoline used for business by Petro-Chem. King was unable to pinpoint those expenditures actually incurred in servicint the company automobile, and we further conclude that all Petro-Chem charges signed by Mrs. King were for gasoline for her personal use or the personal use of King. As will be hereinafter discussed, the record shows that King used his company car for commuting and at times for other personal purposes. This record does not show that the gasoline which Mrs. King may have put into the company car was more than *618 was needed for these personal uses by King of his company car. King in his testimony indicated that some of the charges signed by Mrs. King were for gasoline which went into her personal automobile. He testified in a general way that Mrs. King used her personal car at times for motel business and occasionally to run errands for him or for Petro-Chem. There is, however, nothing in this record to show that any usage by Mrs. King of her personal car to run errands for Petro-Chem was significant. Therefore, we conclude that none of the charges by Mrs. King for gasoline were deductible by Petro-Chem as business expenses. The record is void of explanations as to the identity of the unidentified persons signing the names of King and Sealy to Petro-Chem's oil credit cards. There was no indication that the cards were stolen. Absent indications that those charges were other than for the personal benefit of King or Sealy, we conclude that those amounts also are not deductible by the corporation as business expenses. The record shows that Sealy charged a total of $622.36 to the corporation for gasoline and oil purchased at or near his farm in Bandera, Texas. This $622.36 was a part *619 of the purchses charged to the corporation which respondent disallowed as being for the personal benefit of Sealy. The farm was located approximately 16 to 17 miles from the corporation's deer lease. Sealy testified that he went to the farm about once a week, usually driving either his personal car or a company car. During the deer season he would occasionally drive the company car from Houston to Bandera, to the deer lease, and then back to Houston. Sealy argues that a portion of those charges incurred near the farm might be attributable to travel to and from the deer lease to conduct the business of Petro-Chem. However, there is no showing of when the gasoline was purchased and how much, if any, was purchased during the deer season. This record totally fails to show that any amount included in the $622.36 of charges was for gasoline used to drive to the deer lease. Also, particulars were not provided as to which trip and what amounts were solely for Sealy's personal use when a trip by Sealy combined a visit to his farm with a trip to the deer lease. Because travel away from home is covered by the substantiation rules of section 274(d) and section 1.274-5(b)(2), Income Tax Regs. *620 (see footnote 5), contrary to petitioners' urging, we cannot invoke the rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Respondent attributed to Sealy constructive dividends of $2,141 in 1972 and $2,403 in 1973 for automobile expenses. Similarly, respondent charged King with constructive dividends of $1,687 in 1972 and $1,451 in 1973 for automobile expenses. Those amounts represent 25 percent of the expenses incurred by Petro-Chem for leasing the two company automobiles. Respondent derived the percentage by estimating the usage of the cars for corporate business as 75 percent of the driving time, and King's and Sealy's personal use of the vehicles as 25 percent of the driving time. The company automobiles were not parked on company premises overnight; rather, King and Sealy each drove the company ears between work and home on a daily basis. Also, as Sealy testified, he sometimes drove the company car to his farm. King did not testify specifically to his personal use of the company car other than driving to and from his home to his office. Commuting expenses are not deductible under section 162 as business expenses, but King and Sealy insist that *621 the drives between work and home were for business purposes. They testified that vandalism problems prevented their parking the cars on Petro-Chem's property. Therefore, they argue, the daily drives were for the business purpose of protecting the automobiles. In our view the argument that the purpose for parking the cars at King's and Sealy's homes was to prevent vandalism was an afterthought. The main function served by driving the cars from home to office and return was proving both King and Sealy with daily transportation to and from work. There is no showing in this record that the company automobiles could not have been parked in a commercial lot or garage near Petro-Chem's business location. Also, the record shows that other personal usage was made of the automobiles by King and Sealy. We conclude that respondent properly charged King and Sealy with constructive dividends for automobile maintenance. Insurance premiums on the rented automobiles cost Petro-Chem $501 annually per car. Respondent disallowed a total of $125.25 yearly per car and charged that amount as constructive dividends to King and Sealy. Respondent's calculation was derived by attributing 25 percent *622 of the cars' usage and expenses to King and Sealy personally. There is no evidence in the record to show error in this determination of respondent, and therefore we sustain it. Petro-Chem purchased medical insurance for both King and Sealy throughout the years in issue. [10] Additionally, in its fiscal year 1973, the corporation paid $170.16 for the medical insurance of Mrs. King. In its fiscal year 1974, Petro-Chem paid medical insurance premiums of $170.16 for Mrs. King and $113.44 for Mrs. Sealy. Respondent disallowed the amounts of medical insurance paid for Mrs. King and Mrs. Sealy as business expenses of Petro-Chem and charged King and Sealy with constructive dividends in the amounts of the payments. Neither Mrs. King nor Mrs. Sealy were employees of Petro-Chem, and no showing has been made in this record of why these payments could benefit Petro-Chem. We therefore sustain respondent's determination that these corporate payments were made to personally benefit King and Sealy. For this reason we hold that respondent properly disallowed the claimed deductions to Petro-Chem and included the amounts as dividends to King and Sealy. *623 In its fiscal year 1974, $48.50 was paid by Petro-Chem to Texas Farmers Insurance Co. Respondent determined that the amount represented an automobile insurance premium paid by the corporation on behalf of Sealy.Sealy presented no evidence to the contrary, and therefore we conclude that the $48.50 was a constructive dividend to Sealy rather than a business expense of Petro-Chem. Petro-Chem claimed business expense deductions for living and travel expenditures in its fiscal years 1973 and 1974 of $192,230 and $128,228, respectively. Respondent disallowed $1,787 for 1973 and $902 for 1974, which amounts were composed of the following: (1) in its fiscal year 1974 a payment to Nick Commiato d/b/a Gulfgate Travel in the amount of $110; (2) American Express payments totaling $1,189.98 in its fiscal year 1973 and $612.21 in its fiscal year 1974; (3) payments to Vernon Cantrell of $527 in its fiscal year 1973; and (4) Southwest Airlines payments in its fiscal years 1973 and 1974 of $70 and $180, respectively. The payment to Nick Commiato was incurred as a result of parking the company's recreational vehicle in a commercial lot during the non-hunting season. Because the recreational *624 vehicle does not meet the section 274 test of a facility used primarily for business, the operating expenses associated therewith are not properly deductible by the corporation. Therefore, the payment to Nick Commiato is not a deductible business expense of Petro-Chem. Corporate American Express charge cards were issued to both King and Sealy, but in accord with the American Express policy each card was issued in the individual's name rather than in the name of Petro-Chem. King also held a personal American Express charge card, distinguishable from the corporate card by number only. Because of the slight difference in the cards, King admitted that mistakenly he may have charged personal items on the company charge card. The American Express charge tickets were unavailable for the years in issue, and consequently charges for specific items could not be traced to one card or another. Because the American Express corporate charge card was used primarily for expenditures while traveling away from home, in order to allow the corporation a business deduction, the substantiation requirements of section 274(d) and 1.274-5(b)(2), Income Tax Regs., must be met. (See footnote 5.) Petitioners *625 were unable to supply information on the time, place, business purpose, and business relationship of any person entertained for the charges to the Petro-Chem American Express account. Because of a total lack of any showing of error in respondent's determination disallowing the deductions for the charges to the Petro-Chem American Express card in the amounts above stated, we sustain respondent's disallowance of these amounts. The record shows that Petro-Chem paid Southwest Airlines $70 on April 10, 1972, and $180 on March 7, 1973. There is some testimony in the record that these amounts may have been paid for flights between Houston and San Antonio when Sealy traveled to the deer lease. However, the dates of the payments indicate to the contrary, leaving the impression that Sealy flew to San Antonio because of its close proximity to his personal farm in Bandera, Texas. Furthermore, the section 1.274-5(c)(2), Income Tax Regs., requirements of specification of business purpose, place, and time away from home were not satisfied. The fourth issue is whether respondent properly disallowed a portion of Petro-Chem's claimed deductions for payroll taxes in the amount of $21,640 and *626 for officers' salaries totaling $65,000 for its fiscal year 1973. Respondent disallowed $1,000 from each category. Because no evidence was introduced into the record indicating that Petro-Chem incurred more than $20,640 of deductible payroll taxes or greater than $64,000 of deductible officers' salaries, we sustain respondent's determination. Petro-Chem reported on its Federal income tax return for its fiscal year 1973 that a company Ford pickup truck purchased in 1970 was used as a trade-in against a new truck purchased in March 1972. Respondent determined, however, that Petro-Chem in fact had sold the Ford pickup truck to Sealy in 1972, and respondent therefore increased the amount of Petro-Chem's taxable income for its fiscal year 1973 by $563. Petitioners introduced no evidence to show error in respondent's determination. Therefore, we sustain respondent's determination. No evidence was submitted with respect to equipment and office furniture depreciation. Petitioners bear the burden of proving the correctness of their claimed deductions, and they have not satisfied that burden. We therefore sustain respondent's determination disallowing carpeting depreciation in its *627 fiscal year 1974. The allowance by respondent of only $59 for office furniture depreciation to Petro-Chem in its fiscal year 1974 rather than the claimed $80 is sustained. The next issue concerns Sealy's contention that he engaged in the activity of horse farming as a profitmaking venture in the years 1972 and 1973. He argues that for this reason he is entitled to deduct, under section 165, losses sustained from that activity in excess of the gross income earned in the activity. Respondent asserts that the horse farming was not an activity engaged in for profit but rather a hobby. Section 183(a) provides that an activity not engaged in for profit by an individual or an electing small business corporation (defined in section 1371(b)) does not qualify for deductions attributable to the activity unless specifically provided for by section 183(b). [11]
*628 Section 183(c) defines activities not engaged in for profit: (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Section 183(d) creates a presumption in the case of an activity consisting in major part of breeding, showing, training, or racing horses. If the gross income derived from that activity for two or more of the taxable years in a period of seven consecutive taxable years exceeds the deductions attributable to the activity, then that activity is presumed to have been engaged in for profit, unless the Commissioner establishes that the activity is a hobby. Section 183(d) provides: (d) Presumption.--If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activty is engaged in for profit), then, unless the Secretary establishes to the *629 contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years. The presumption of section 183(d) applies only with regard to the second profitable year and all subsequent years within the five or seven year period starting with the first profitable year (section 1.183-1(d), Income Tax Regs.) except as limited by the special rule of section 183(e), which states: (e) Special Rule.-- (1) In general.--A determination as to whether the presumption provided by subsection (d) applies with respect to any activity shall, if the taxpayer so elects, not be made before the close of the fourth taxable year (sixth taxable year, in the case of an activity described in the last sentence of such subsection) following the taxable year in which the taxpayer first engages in the activity. For purposes of the preceding sentence, a taxpayer shall be treated as not having *630 engaged in an activity during any taxable year beginning before January 1, 1970. (2) Initial period.--If the taxpayer makes an election under paragraph (1), the presumption provided by subsection (d) shall apply to each taxable year in the 5-taxable year (or 7-taxable year) period beginning with the taxable year in which the taxpayer first engages in the activity, if the gross income derived from the activity for 2 or more of the taxable years in such period exceeds the deductions attributable to the activity (determined without regard to whether or not the activity is engaged in for profit). (3) Election.--An election under paragraph (1) shall be made at such time and manner, and subject to such terms and conditions, as the Secretary may prescribe. Respondent asserts that the presumption is inoperative as to Sealy since 1972 was the first year of the Sealy horse farm operation. Sealy reported losses for the years 1972 and 1973 in the amounts of $6,662 and $7,616, respectively. No evidence was presented with regard to 1974. However, he reported gains in 1975 and 1976. Therefore, the presumption of section 183(d) would only arise as to 1976, the second profitable year. *631 Sealy does not contend that section 183(e) applies to permit him to postpone determination as to the existence of profit. He concedes that it is necessary to make an election for section 183(e) to apply and that he did not elect to defer the determination of whether the section 183(d) presumption applied. Sealy argues that absent such an election the farm operation cannot be conslusively and irrebuttably labeled on activity not engaged in for profit. We agree that the absence of presumption that the activity was engaged in for profit is not conclusive that it was in fact not engaged in for profit. It is necessary to consider all of the facts and circumstances presented in the record to make the factual determination of whether Selay's horse farming operation was an activity engaged in for profit. Engdhal v. Commissioner, 72 T.C. 659 (1979). Considering all of these facts amd circumstances, we conclude that the horse farming activity was not engaged in for profit. Our conclusion is based upon the standard for determining in the case of individuals or small business corporations (1) whether either is engaged in a trade or business whereby the expenses are deductible *632 under section 162; (2) whether the expenses were incurred or paid for the production or collection of income, therefore qualifying as deductible expenditures under section 212(1); and (3) whether expenses were incurred or paid for the management, conservation, or maintenance of property held for the production of income, thereby qualifying as deductible under section 212(2). In Allen v. Commissioner, 72 T.C. 28, 33 (1979), we stated the objective criterion as: did the individual engage in the activity with the predominant purpose and intention of making a profit. Dunn v. Commissioner, 70 T.C. 715, 720 (1978); Churchman v. Commissioner, 68 T.C. 696, 701 (1977); Jasionowski v. Commissioner, 66 T.C. 312, 319 (1976); Benz v. Commissioner, 63 T.C. 375, 383 (1974). Although the taxpayer's expectation of profit need not be reasonable, it must nevertheless be a good-faith expectation.Sec. 1.183-2(a), Income Tax Regs.; Dunn v. Commissioner, supra at 720; Churchman v. Commissioner, supra at 321; Benz v. Commissioner, supra at 383. The taxpayer bears the *633 burden of proving the existence of the requisite intent. Engdahl v. Commissioner, supra at 666; Boyer v. Commissioner, 69 T.C. 521, 537 (1977), on appeal (7th Cir., July 7, 1978). No one fact is determinative of any taxpayer's intention to engage in a profitmaking activity. Case law has approved section 1.183-2(b), Income Tax Regs., listing some of the relevant factors to be considered in determining whether an activity is engaged in for profit. Engdahl v.Commissioner,supra at 666; Allen v. Commissioner,supra at 33. [12]
*634 We are not persuaded by Sealy's argument that his intent from the initial purchase of the farm was to make a profit, and as he expressed, "that the resultant loss was from an unforeseen event -- the closing of the Loss Valley Downs in Bandera." The record shows that Loss Valley Downs was not closed until about the end of the last year here in issue. Therefore, the only reason assigned by Sealy for the losses is not applicable to the years here in issue. Furthermore, there are many factors in this record which point to the conclusion that Sealy did not intend to make a profit on the horse farming operation.Sealy did not maintain complete and accurate records of expenses incurred in his farm operations. He assigned all responsibility of running the farm and accounting for the operating costs to his foreman.Yet Sealy acknowledged that he was unaware of the foreman's capability or lack thereof for keeping financial records. Sealy admitted that he had no experience with the raising and breeding of horses. Instead he totally relied upon his ranch foreman, who, in Sealy's own words, "did a very poor job." Sealy devoted little of his own time to the farm. The fact that the farming operation *635 was not carried on in a businesslike manner is indicative that it was not an activity carried on for profit. Sealy is entitled only to deduct interest and ad valorem taxes under sections 163 and 164. Any constructive dividends attributable to Sealy because of payments made on behalf of his farming activity by Petro-Chem are not deductible as expenses incurred in business or the production or management of income. Those dividends include corporate payments for farm supplies, travel to and from the farm, contract services and other similar expenses. The next issue is whether respondent's adjustments to Mr. and Mrs. King's reported 1972 and 1973 gross receipts, operating expenses and depreciation relating to their motel operation were proper. Mr. and Mrs. King operated the Kemah Motel in Kemah, Texas, during the years in issue.On their income tax returns they recognized gross receipts of $10,069 and $10,474, in the calendar years 1972 and 1973, respectively. Respondent determined that gross receipts from the motel operation amounted to $10,022 in 1972 and $11,626 in 1973. Respondent in his notice of deficiency also disallowed $1,904 of the $6,529 and $1,384 of the $7,608 claimed *636 as motel operating expenses in 1972 and 1973, respectively. The Kings deducted on their Federal income tax returns depreciation on their motel property of $158 in 1972 and $390 in 1973. Respondent in the notice of deficiency determined the proper amounts to be $117 and $299, respectively. Because the Kings have not introduced evidence to show that respondent's determinations are inaccurate, we sustain respondent's position with regard to the King's motel expenditures and income. Mr. and Mrs. King owned several rental properties in Texas, including one in Pasadena and one in Houston. For the calendar year 1972 Mr. and Mrs. King claimed a net loss from the Pasadena property of $1,498.91 and in 1973 a loss of $1,474 was claimed from that property.With respect to the Houston rental property they claimed losses of $1,705.94 and $1,496 in 1972 and 1973, respectively. Respondent in his notice of deficiency determined these losses to be as follows: for the Pasadena property, a loss of $1,584 in 1972 and a loss of $921 in 1973; and for the Houston property, a loss of $556 in 1972 and $129 in 1973. Mr. and Mrs. King failed to introduce evidence to show that respondent's determinations *637 were incorrect, and therefore we sustain respondent's determination of the rental losses. Mr. and Mrs. King purchased a house in Kemah, Texas, in 1972, which property was unrenovated. King's brother-in-law moved into the home and did some renovation work on it. In 1972 he lived in the house for approximately three to four months and paid a total of $125 rent. For 1972, Mr. and Mrs. King claimed a net loss with respect to the Kemah, Texas, property of $465.72. In 1973 Mr. and Mrs. King collected $525 in rents from the Kemah property and after deducting certain expenses claimed in their 1973 tax return a loss of $1,831 on that rental property. King's brother-in-law continued to live in the house in 1973 for an undisclosed period of time. Respondent contends that the Kemah property was not held for rental purposes. The facts in this case indicate that the Kemah property was not used or held in 1972 and 1973 with the intent of making a profit. By King's own admission the property even after renovation was in substandard condition. King put little effort into the renovation process, but instead he left the restoration work to his brother-in-law, Myers. At trial King was unable *638 to attach a monetary valuation to the worth of Myers' labors. There is no showing in this record of the fair rental value of the property. Myers was a relative of King's. Nothing in the evidence indicates that during 1972 and 1973 the Kings had any intent to make a profit from the rental of the Kemah property. Insofar as this record shows, the rent paid by King's brother-in-law was not geared to producing a profit. On this basis we sustain respondent's disallowance of the claimed rental loss on the Kemah property. See Jasionowski v. Commissioner,66 T.C. 312, 322 (1976). Accordingly, the ad valorem taxes paid with regard to the Kemah property are deductible under section 164 rather than as rental expenses. Moreover, the interest expense in the amount of $778 for 1973 is deductible under section 163 of the Code rather than as the claimed rental expense. King argues that those items of contract services charged to him as constructive dividends for Dennis Fogarty and Chuck Hoy should be allowed to him as deductions for expenses incurred on properties held for the production of income, namely the Pasadena and Houston rental properties. King testified that Fogarty *639 roofed both his rental property and his personal home, but he could not distinguish amongst the particular payments. Therefore, we conclude that those constructive dividends associated with Dennis Fogarty are not deductible by King. King testified that Chuck Hoy replaced gutters on two rental properties in November 1973. However, King was not confident as to which of the properties had replacement gutters, and because King regarded the Kemah house as rental property, which we have concluded to the contrary, the $355 paid to Chuck Hoy also is not a deductible expense.
The final issue for consideration is whether respondent properly determined that each Petro-Chem, King, and Sealy is liable for additions to their respective taxes under section 6653(a) for the years in issue due to a negligent or intentional disregard of the rules and regulations. Respondent's position is based upon the assertion that Petro-Chem, King, and Sealy deviated from "the fundamental principles of recordkeeping", and that King and Sealy each lacked adequate records with respect to their personal properties. The 5 percent penalty addition to tax may be imposed if a taxpayer has failed to maintain accurate *640 or adequate records or ledgers from which the proper income and deductions are determinable. Zivnuska v. Commissioner,33 T.C. 226, 240 (1959). Respondent's determination in the notice of deficiency that a portion of an underpayment of tax is due to negligence or intentional disregard of rules and regulations raises the presumption of correctness and imposes upon the taxpayer the burden of proving that the levying of the penalty is erroneous. Courtney v. Commissioner,28 T.C. 658, 669 (1957); Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part a Memorandum Opinion of this Court. It is our opinion that none of the petitioners in the instant case have supplied sufficient evidence to prove that the imposition of the addition to tax is incorrect. A taxpayer cannot avoid the duty of filing accurate tax returns by foisting that responsibility onto the bookkeeper. Bailey v. Commissioner,21 T.C. 678, 687 (1954). A taxpayer who makes no effort to prevent errors in bookkeeping is negligent within the meaning of section 6653(a). Leroy Jewelry Co. v. Commissioner,36 T.C. 443, 445-446 (1961). *641 The Petro-Chem accountant in 1968 established "draw" accounts for each King and Sealy, which accounts were in effect during the years in issue. Theoretically under that system as company checks were issued in payment for personal acquisitions and expenditures by either King or Sealy, the bookkeeping service would credit the appropriate draw account with the moneys paid.However, by Sealy's own admission personally he did not regulate the draw accounts to determine that the accounts were actually credited for each corporate payment made on behalf of either shareholder. In fact, we have found that a number of payments made by Petro-Chem personally benefiting King and Sealy were never charged against the proper accounts. With regard to their personal incomes and expenses, both King and Sealy completely failed to maintain accurate records of their transactions. Sealy lacked account books or ledgers on his horse farming operation. The record is void of evidence of any attempt by King to keep such records on his rental properties and motel operation. Petitioners argue that the section 6653(a) penalty is inapplicable when the taxpayer fails to comply with the section 274 provisions *642 if some detailed records are kept. We need not consider the legal validity of the argument since the evidence here shows that no proper records of many business transactions were kept by any of petitioners. Decision will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: H. Gilbert Sealy and Mary E. Sealy, docket No. 4519-77; Petro-Chem Technical Services, Inc., docket No. 4542-77; and Fred T. King, Jr. and Lorraine King, docket No. 4737-77.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
3. On his 175 and 1976 Federal income tax returns (Schedule F) Sealy reported the following income and deductions from the farm operation: ↩
1975
1976
Income
Income
Mare lease
$1,200 Profit on sale
Deduction
of mare & colt $ 450 Depreciation
(500)
Stud fees
600 Profit $ 700 Total
$1,050 Deduction
Depreciation
(500)
Profit $ 550 4. Section 274(a) provides: SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (a) Entertainment, Amusement, or Recreation.-- (1) In general.--No deduction otherwise allowable under this chapter shall be allowed for any item-- (A Activity.--With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or (B) Facility.--With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business.↩
5. Sec. 1.274-5 Substantiation requirements. * * *
(b Elements of an expenditure--(1) In general.Section 274(d) and this section contemplate that no deduction shall be allowed for any expenditure for travel, entertainment, or a gift unless the taxpayer substantiates the following elements for each such expenditure: (i) Amount; (ii) Time and place of travel or entertainment (or use of a facility with respect to entertainment), or date and description of a gift; (iii) Business purpose; and (iv) Business relationship to the taxpayer of each person entertained, using an entertainment facility or receiving a gift. (2) Travel. The elements to be proved with respect to an expenditure for travel are-- (i) Amount. Amount of each separate expenditure for traveling away from home, such as cost of transportation or lodging, except that the daily cost of the traveler's own breakfast, lunch, and dinner and of expenditures incidental to such travel may be aggregated, if set forth in reasonable categories, such as far meals, for gasoline and oil, and for taxi fares; (ii) Time. Dates of departure and return for each trip away from hoem, and number of days away from home spent on business; (iii) Place. Destinations or locality of travel, described by name of city or town or other similar designation; and (iv) Business purpose. Business reason for travel or nature of the business benefit derived or expected to be derived as a result of travel. (3) Entertainment in general. Elements to be proved with respect to an expenditure for entertainment are-- (i) Amount. Amount of each separate expenditure for entertainment, except that such incidental items as taxi fares or telephone calls may be aggregated on a daily basis; (ii) Time. Date of entertainment; (iii) Place. Name, if any, address or location, and designation of type of entertainment, such as dinner or theater, if such information is not apparent from the designation of the place; (iv) Business purpose. Business reason for the entertainment or nature of business benefit derived or expected to be derived as a result of the entertainment and, except in the case of business meals described in section 274(e)(1), the nature of any business discussion or activity; (v) Business relationship.↩ Occupation or other information relating to the person or persons entertained, including name, title, or other designation, sufficient to establish business relationship to the taxpayer. 6. Sec. 1.274-5(c), Income Tax Regs., substantiation requirements, states: (c) Rules for substantiation--(1) In general. A taxpayer must substantiate each element of an expenditure (described in paragraph (b) of this section) by adequate records or by sufficient evidence corroborating his own statement except as otherwise provided in this section. Section 274(d) contemplates that a taxpayer will maintain and produce such substantiation as will constitute clear proof of an expenditure for travel, entertainment, or gifts referred to in section 274. A record of the elements of an expenditure made at or near the time of the expenditure, supported by sufficient documentary evidence, has a high degree of credibility not present with respect to a statement prepared subsequent thereto when generally there is a lack of accurate recall. Thus, the corroborative evidence required to support a statement not made at or near the time of the expenditure must have a high degree of probative value to elevate such statement and evidence to the level of credibility reflected by a record made at or near the time of the expenditure supported by sufficient documentary evidence. The substantiation requirements of section 274(d) are designed to encourage taxpayers to maintain the records, together with documentary evidence, as provided in subparagraph (2) of this paragraph. To obtain a deduction for an expenditure for travel, entertainment, or gifts, a taxpayer must substantiate, in accordance with the provisions of this paragraph, each element of such an expenditure. (2) Substantiation by adequate records--(i) In general. To meet the "adequate records requirements of section 274(d), a taxpayer shall maintain an account book, diary, statement of expense or similar record (as provided in subdivision (ii) of this subparagraph) and documentary evidence (as provided in subdivision (iii) of this subparagraph) which, in combination, are sufficient to establish each element of an expenditure specified in paragraph (b) of this section. It is not necessary to record information in an account book, diary, statement of expense or similar record which duplicates information reflected on a receipt so long as such account book and receipt complement each other in an orderly manner. (ii) Account book, diary, etc. An account book, diary, statement of expense or similar record must be prepared or maintained in such manner that each recording of an element of an expenditure is made at or near the time of the expenditure. (a) Made at or near the time of the expenditure. For purposes of this section, the phrase "made at or near the time of the expenditure" means the elements of an expenditure are recorded at a time when, in relation to the making of an expenditure, the taxpayer has full present knowledge of each element of the expenditure, such as the amount, time, place and business purpose of the expenditure and business relationship to the taxpayer of any person entertained. An expense account statement which is a transcription of an account book, diary, or similar record prepared or maintained in accordance with the provisions of this subdivision shall be considered a record prepared or maintained in the manner prescribed in the preceding sentence if such expense account statement is submitted by an employee to his employer or by an independent contractor to his client or customer in the regular course of good business practice. (b) Substantiation of business purpose. In order to constitute an adequate record of business purpose within the meaning of section 274(d) and this subparagraph, a written statement of business purpose generally is required. However, the degree of substantiation necessary to establish business purpose will vary depending upon the facts and circumstances of each case. Where the business purpose of an expenditure is evident from the surrounding facts and circumstances, a written explanation of such business purpose will not be required. For example, in the case of a salesman calling on customers on an established sales route, a written explanation of the business purpose of such travel ordinarily will not be required. Similarly, in the case of a business meal described in section 274(e)(1), if the business purpose of such meal is evident from the business relationship to the taxpayer of the persons entertained and other surrounding circumstances, a written explanation of such business purpose will not be required. * * *
(3) Substantiatoin by other sufficient evidence. If a taxpayer fails to establish to the satisfaction of the district director that he has substantially complied with the "adequate records" requirements of subparagraph (2) of this paragraph with respect to an element of an expenditure, then, except as otherwise provided in this paragraph, the taxpayer must establish such element-- (i) By his own statement, whether written or oral, containing specific information in detail as to such element; and (ii) By other corroborative evidence sufficient to establish such element. If such element is the description of a gift, or the cost, time, place, or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element, or the documentary evidence described in subparagraph (2) of this paragraph.If such element is either the business relationship to the taxpayer of persons entertained or the business purpose of an expenditure, the corroborative evidence may be circumstantial evidence. (4) Substantiation in exceptional circumstances. If a taxpayer establishes that, by reason of the inherent nature of the situation in which an expenditure was made-- (i) He was unable to obtain evidence with respect to an element of the expenditure with conforms fully to the "adequate records" requirements of subparagraph (2) of this paragraph. (ii) He is unable to obtain evidence with respect to such element which conforms fully to the "other sufficient evidence" requirements of subparagraph (3) of this paragraph, and (iii) He has presented other evidence, with respect to such element, which possesses the highest degree of probative value possible under the circumstances, such other evidence shall be considered to satisfy the substantiation requirements of section 274(d)↩ and this paragraph.
7. Sec. 1.274-2(c)(3), Income Tax Regs., states: (3) Directly related in general. Except as provided in subparagraph (7) of this paragraph, an expenditure for entertainment shall be considered directly related to the active conduct of the taxpayer's trade or business if it is established that it meets all of the requirements of subdivisions (i), (ii), (iii) and (iv) of this subparagraph. (i) At the time the taxpayer made the entertainment expenditure (or committed himself to make the expenditure), the taxpayer had more than a general expectation of deriving some income or other specific trade or business benefit (other than the goodwill of the person or persons entertained) at some indefinite future time from the making of the expenditure. A taxpayer, however, shall not be required to show that income or other business benefit actually resulted from each and every expenditure for which a deduction is claimed. (ii) During the entertainment period to which the expenditure related, the taxpayer actively engaged in a business meeting, negotiation, discussion, or other bona fide business transaction, other than entertainment, for the purpose of obtaining such income or other specific trade or business benefit (or, at the time the taxpayer made the expenditure or committed himself to the expenditure, it was reasonable for the taxpayer to expect that he would have done so, although such was not the case solely for reasons beyond the taxpayer's control). (iii) In light of all the facts and circumstances of the case, the principal character or aspect of the combined business and entertainment to which the expenditure related was the active conduct of the taxpayer's trade or business (or at the time the taxpayer made the expenditure or committed himself to the expenditure, it was reasonable for the taxpayer to expect that the active conduct of trade or business would have been the principal character or aspect of the entertainment, although such was not the case solely for reasons beyond the taxpayer's control). It is not necessary that more time be devoted to business than to entertainment to meet this requirement. The active conduct of trade or business is considered not to be the principal character or aspect of combined business and entertainment activity on hunting or fishing trips or on yachts and other pleasure boats unless the taxpayer clearly establishes to the contrary. (iv) The expenditure was allocable to the taxpayer and a person or persons with whom the taxpayer engaged in the active conduct of trade or business during the entertainment or with whom the taxpayer establishes he would have engaged in such active conduct of trade or business if it were not for circumstances beyond the taxpayer's control.For expenditures closely connected with directly related entertainment, see paragraph (d)(4) of this section.↩
8. Sec. 1.274-5(c)(6)(iii), Income Tax Regs., reads as follows: (iii) Primary use of a facility.Section 274(a)(1)(B) provides that no deduction shall be allowed for any item with respect to a facility used in connection with an entertainment activity unless the taxpayer establishes that the facility was used primarily for the furtherance of his trade or business. A determination whether a facility was used primarily for the furtherance of the taxpayer's trade or business will depend upon the facts and circumstances of each case. In order to establish that a facility was used primarily for the furtherance of his trade or business, the taxpayer shall maintain records of the use of the facility, the cost of using the facility, mileage or its equivalent (if appropriate), and such other information as shall tend to establish such primary use. Such records of use shall contain-- (a) For each use of the facility claimed to be in furtherance of the taxpayer's trade or business, the elements of an expenditure specified in paragraph (b) of this section, and (b) For each use of the facility not in furtherance of the taxpayer's trade or business, an appropriate description of such use, including cost, date, number of persons entertained, nature of entertainment and, if applicable, information such as mileage or its equivalent. A notation such as "personal use" or "family use" would, in the case of such use, be sufficient to describe the nature of entertainment.
If a taxpayer fails to maintain adequate records concerning a facility which is likely to serve the personal purposes of the taxpayer, it shall be presumed that the use of such facility was primarily personal.↩
9. Petro-Chem attempted to corroborate the testimony of its officers with respect to the deer lease with the testimony of Mr. L. C. Massey, an employee of Chevron Oil Company. He testified that he went to the deer lease at least three timnes a year and sometimes stayed as long as four days. He stated he went in both 1972 and 1973. He testified that on occasions he discussed the needs of Petro-Chem for jobs and employees with King and Sealy when at the deer lease. King had testified that at some undisclosed time Mr. Massey had arranged for a pollution control contract for Petro-Chem with Chevron.Mr. Massey, when asked about how often he had discussions with King and Sealy concerning Petro-Chem's need for jobs and employees, stated: Well, about -- I'd say about once a week maybe.We didn't do this every day, but we -- maybe twice each time we was down there. He'd just would bring up a little something. He said he needed some men for -- in some kind of -- that was in some certain field, or something, he asked if maybe somebody was retiring or such as that, and I tried to get him one other contract, but everything was transferred to Lafayette, so I did not get that for them. Mr. Massey could recall the names of only five other persons who attended hunts at the deer lease but did not know whether any of these persons were there in 1972 or 1973. He was further unable to specify any particular year that these persons actually attended the deer hunts. Also, he did not know whether any of these people discussed Petro-Chem's job and employee needs, except he did overhear some talk that Petro-Chem hired one of these guest hunters.↩
10. These amounts were not disallowed by respondent and there is no issue with respect to these payments.↩
11. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions a allowable by reason of paragraph (1).↩
12. Sec. 1.183-2 Activity not engaged in for profit defined. * * *
(b) Relevant factors. In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa. Among the factors which should normally be taken into account are the following: (1) Manner in which the taxpayer carries on the activity. The fact that the taxpayer carries on the activity in a business like manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated.A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive.
(2) The expertise of the taxpayer or his advisors. Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Where a taxpayer has such preparation or procures such expert advice, but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity. (3) The time and effort expended by the taxpayer in carrying on the activity. The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity. (4) Expectation that assets used in activity may appreciate in value. The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. See, however, paragraph (d) of sec. 1.183-1 for definition of an activity in this connection.
(5) The success of the taxpayer in carrying on other similar or dissimilar activities. The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. (6) The taxpayer's history of income or losses with respect to the activity. A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit. (7) The amount of occasional profits, if any, which are earned. The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. (8) The financial status of the taxpayer. The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. (9) Elements of personal pleasure or recreation↩. The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. For example, the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit. An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit.Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph.